In re CONSOLIDATED MEDICAL TRANSPORT, INC., Debtor.

Bennett Three Leasing Services, Inc., d/b/a Daley's Ambulance Service, Plaintiff,

v.

Consolidated Medical Transport, Inc., Defendant.

Daley's Medical Rental Supply, Inc., Plaintiff,

v.

Daleyco, Inc. d/b/a Daley's Ambulance Service and Bennett Three Leasing Services, Inc., Defendants, Third–Party Plaintiffs,

v.

Consolidated Medical Transport, Inc., Third–Party Defendant.

Bankruptcy No. 00 B 21108.
Adversary Nos. 01 A 00458, 02 A 00210.

United States Bankruptcy Court,
N.D. Illinois,
Eastern Division.

Oct. 17, 2003.

Keevan Morgan, Morgan & Bley Ltd., Chicago, IL, for Debtor/Defendant.

Jose A. Isasi, Sachnoff & Weaver, Chicago, IL, for Plaintiff.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

JACK B. SCHMETTERER, Bankruptcy Judge.

These adversary proceedings consolidated for trial relate to the bankruptcy case filed by Debtor–Defendant Consolidated Medical Transport, Inc. d/b/a CoMed Transport ("CoMed" or "Debtor–Defendant") under Chapter 11. They involve an ongoing dispute stemming from the sale in bankruptcy of CoMed's assets under 11 U.S.C. § 363 to Bennett Three Leasing Services, Inc., and to Bennett's nominee Daleyco, Inc, d/b/a Daley's Ambulance Service (collectively "Bennett" or "Plaintiff"). Bennett seeks judgment that the Debtor–Defendant breached certain provi-

sions of the purchase agreement with respect to assigned medicare receivables, and that Comed made misrepresentations regarding an expired lease also assigned to it through the sale.

The Adversary proceedings were tried, evidence taken, the parties rested, and the Court now makes and enters the following Findings of Fact and Conclusions of Law.

For reasons detailed below, judgment will enter for Plaintiff on Count I of Adversary 01 A 00458 and Count I of the Counter-complaint in Adversary 02 A 00210 (the Medicare issue), and in favor of Debtor–Defendant as to Count II of Adversary 01 A 00458 and Count II of the Counter-complaint in Adversary 02 A 00210 (the Lease issue).

### HISTORY AND RELATED LITIGATION

The parties used the sale as a starting point for extensive litigation.

CoMed filed a four-count lawsuit against Bennett on May 11, 2001 in Adversary Complaint No. 01 A 00440. It alleged that Bennett breached the purchase agreements by failing to make payments to former Comed employees, permitting Comed's property to be damaged while in its care, for failure to pay rent for the occupancy of premises at 1234 Sibley Boulevard, and for failing to turn over certain accounts receivables collected on behalf of Comed. On October 25, 2001 the parties settled three out of the four Counts of that Adversary, and the remaining count was dismissed.

Bennett filed the first of the two captioned Adversary proceedings against CoMed on May 15, 2001. Adversary Complaint 01 A 00458. It alleged in Count I that CoMed breached the Lot 2 Purchase Agreements relating to certain medicare accounts receivables by causing the government agencies administrating Medicare to have a claim against those accounts receivables, thus rendering them uncollectible. Count II alleged breach of contract based on Bennett's purchase of a purported "month-to-month lease" on the dispatch center at 1234 Sibley Boulevard ("Sibley Lease") which lease, according to Bennett, had already expired. Bennett charged in Count III that John Daley, Jr., President of CoMed, was unjustly enriched as a result of payments made to obtain the purported "month-to-month lease." Count IV alleged breach of contract for failure to turnover property that was purportedly assigned as part of a contract with the Town of Munster. Count V pleaded breach of contract based on Comed's alleged failure to credit certain payments of 401(k) funds withheld from the paychecks of former Comed employees. CoMed responded with successive motions to dismiss and for summary judgment, which were earlier denied.

Daley's Medical Rental Supply, Inc., ("Daley's") initiated the second captioned Adversary proceeding against Bennett alleging that it was owed payments for use and rental of oxygen tanks installed on ambulances sold at CoMed's asset sale. Adversary 02 A 00210. Daley's Adversary Complaint prompted Bennett to file a third-party complaint in Adversary 02 A 00210 alleging that CoMed was ultimately responsible for the oxygen storage tanks.

CoMed responded by denying responsibility for the storage tanks and asserting a five-count counterclaim for declaratory judgment. *See 02 A 00210 Debtor–Defendant's Answer, Affirmative Defenses, and Counter–Complaint to Amended Third–Party Complaint.* Count I of CoMed's counterclaim requested a declaratory judgment that CoMed sold the Medicare accounts free and clear of all liens and encumbrances. Count II sought a declara-

tion that Bennett is judicially estopped from asserting that it did not receive a valid month-to-month lease under the purchase agreement. Counts III, IV, and V asserted other theories which are not of concern because they were later settled.

Bennett sought dismissal of the counter-complaint on grounds that issues raised therein were the same as those in Adversary 01 A 00458. That motion was denied.

Daley's and Bennett subsequently settled many issues. However, their settlement did not affect CoMed's counterclaims in Adversary 02 A 00210 or Bennett's Counts in *Adversary 01 A 00458.*

Although the foregoing settlement mooted the third party complaint in Adversary 02 A 00210, the counter-claims seeking declarations that overlapped with Adversary 01 A 00458 were preserved. A pretrial order consolidated for purposes of trial Counts I–IV of the Debtor's Counter–Complaint, Adversary 02 A 00210, with Adversary 01 A 00458. (*See* Final Pretrial Order November 26, 2003.) Bennett later voluntarily dismissed with prejudice Count III of Adversary 01 A 00458. On February 24, 2003, CoMed and Bennett reached a settlement as to Counts IV and V. of Adversary 01 A 00458 and CoMed's Counterclaim Counts III, IV, and V. in Adversary 02 A 00210. The settlement was approved by the Court on the record, February 24, 2003, though an order to that effect has not yet been entered.[1] Transcript of Proceedings Feb. 24, 2003.

The remaining issues in dispute that went to consolidated trial involved the Medicare accounts receivable issue (Count I of Adversary 01 A 00458 and Count I of the counter-complaint in Adversary 02 A 00210) and the Sibley lease (Count II of Adversary 01 A 00458 and Count II of the counter-complaint in Adversary 02 A 00210).

## MATTERS IN DISPUTE

### *Medicare Accounts 01 A 00458 (Count I) and 02 A 00210 (Counterclaim Count I)*

Bennett contends that CoMed's failure to disclose the government's investigation and suspension of payments of Medicare receivables prior to the asset sale relieves Bennett of responsibility in the event the Federal Health Care Financing Administration ("HCFA") were to seek a future repayment, or in the event that a private *qui tam* action by former CoMed employees were to obtain such relief. Bennett argues that related information provided by CoMed during the due diligence period prior to the sale was insufficient; criticizes the marketing of CoMed's assets by representatives of Abrams (the firm that marketed the sale for CoMed); and argues that CoMed willfully failed to disclose information explaining that a lawsuit filed in 1996 by private parties and joined in by the government prior to the sale would affect the Medicare accounts receivable. Plaintiff's Amended Post Trial Brief at 9. Specifically, Bennett claims that it was never handed a copy of the *qui tam* complaint against CoMed or HCFA notices and order suspending medicare payments, or the government pleading joining in the suit; was not told the amount of damages requested in suit; and that CoMed and Abrams never informed it about the lawsuit and government order freezing Medicare payments even though those actions put in jeopardy any collection of Medicare receivables. Pl.'s Am. Rev. Proposed Findings of Fact ¶ 49–56.

---

1. The Court requested from the parties an order memorializing that settlement, but none has been entered. Such draft order is requested from the parties.

In response, CoMed insists that information given to Bennett was sufficient under the circumstances, and it finds fault with Bennett's due diligence. CoMed points out that the large due diligence binders that it and Abrams supplied contained information on the Medicare accounts receivables dispute, yet representatives of Bennett never read or negligently disregarded the information. Debtor–Defendant's Post–Trial Findings of Fact ¶ 45, 49.

CoMed also contends that Ms. Smith of the Abrams firm discussed the Medicare lawsuit with representatives from Bennett prior to the sale, but no further discussion or information was requested. Debtor–Def. Post–Trial Findings of Fact ¶ 68. According to CoMed, since Bennett was given notice of the Government actions and *qui tam* suit, it was Bennett's responsibility to become familiar with pleadings involved and with government rules pertaining to payment of Medicare accounts receivable that were thereby implicated. Debtor–Def. Post–Trial Findings of Fact ¶ 40.

### Sibley Lease 01 A 00458 (Count II) and 02 A 00210 (Counterclaim Count II)

Bennett claims that CoMed made significant misrepresentations regarding the lease at 1234 Sibley Boulevard which was assumed and assigned to it under 11 U.S.C. § 365 as part of the sale. Bennett asserts that Comed represented that the Sibley lease remained operative on a month to month basis, and represented at the sale auction that amount past due for rent constituted the cure amount necessary to permit assumption by Bennett of that lease. Plaintiff's Amended Findings ¶ 78. Pursuant to these representations, Bennett paid the assertedly past rent due

to John W Daley, President of CoMed. However, Bennett says that it later determined that the lease had expired prior to the bankruptcy filing. *Id.* ¶ 85. Condemning the transaction as an insider deal, Bennett insists that a lease which expired prior to bankruptcy cannot be assumed and assigned under 11 U.S.C § 365. Pl.'s Am. Post–Trial Brief at 14. Moreover, Bennett emphasizes that it paid the arrearage under the impression that payment was a mandatory condition to finalizing the purchase of CoMed's assets.

CoMed replies that the lease remains alive. It points to letters from the landlord which assertedly demonstrate that the landlord intended to create a holdover tenancy. Additionally, CoMed contends that since Bennett was furnished with a copy of the lease before the bidding period, Bennett could have raised any objection to that lease before the auction or refrained from bidding on sale lots containing the lease.

### FINDINGS OF FACT

1. Debtor–Defendant CoMed filed a voluntary Chapter 11 Bankruptcy Petition on July 20, 2000. (Stipulated in Joint Pre–Trial Statement ¶ 1).[2] Prior to the filing of its petition for relief, CoMed provided emergency medical transport services in Chicago and NorthWest Indiana. JPS ¶ 2.

2. As a result of heavy losses incurred after the filing of its petition for relief, CoMed determined that a sale of its assets would be in the best interests of the creditors and the estate. Debtor–Def. Ex. 21 ¶ 3.

3. On November 9, 2000 CoMed requested and was granted authority to sell its assets under §§ 105(A), 363(B), (E) and

**2.** Stipulated facts found in the Joint Pretrial Statement filed by the parties are referred to as "JPS." Joint Trial Exhibits attached to the JPS are cited hereinafter as "JTE."

(F). JPS ¶ 3. The Sale Motion divided CoMed's assets into lots, two of which lots were designated as Lots 1 and 2, and were offered for sale pursuant to the bid procedure set forth in a Notice of Intended Sale. JPS at ¶ 10.

4. CoMed employed the firm of Abrams, Jossler & Knopfler ("Abrams") to market its assets and to solicit prospective bidders. Smith Tr. at 68.[3] Abrams also compiled documents on CoMed's assets for review and examination by prospective bidders in due diligence binders. Plaintiff's Exhibit 3. The due diligence binders contained CoMed's financial data, accounting and business records, contracts, and other documents involving the assets. Pl.'s Ex. 3, Smith Tr. at 81.

5. The due diligence binders included a section titled Brief History. This section summarized CoMed's operational and financial history and stated, in pertinent part,: "[m]anagement also believed that the breathing space allowed by the Chapter 11 filing would allow the Debtor to present a compromise to the United States and the 'Relators' (referring to the *qui tam* action described in Finding No. 24 below) in a dispute concerning the Debtor's 1996 medicare income and related matters." Pl.'s Ex.3.

6. The due diligence binders also included financial reports for the years ending in September 30, 1999 and September 30, 2000 and an accompanying audit of CoMed's balance sheets. In addition to reviewing Comed's pertinent financial data, the audit provided notes to the financial statements listing "certain risks and contingencies." Pl.'s Ex. 3, Report of Wm. Condon & Company ("Condon"), CoMed's auditors. Under Note 16, contingencies, the auditors stated, [t]he Company is un-

der investigation by the U.S. Government for potential fraudulent billing practices. Outside counsel has indicated that a decision by the Government will be made in early 2000 whether or not to bring formal charges. If so, the Company believes the suit will be without merit and intends to vigorously defend its position. Pl.'s Ex. 3, tab 4, Report of Wm. Condon & Company, Ltd, Note 16. This reference in the Condon audit and in Finding No. 5 were the only written disclosures of the medicare problem.

7. The due diligence binders further included a section entitled, "Month to Month Lease From John W. & Betty J. Daley, for Dispatch Center Located At 1234 Sibley Boulevard, Dolton, IL." This section included a copy of the commercial lease between CoMed and South Holland Trust & Savings Bank and indicated an amount of $318,100 as the past due amount on the lease. Pl.'s Ex. 3, tab 9. (*See also* Findings No. 13 and 14.)

8. Interested bidders could review these due diligence binders for several weeks prior to the auction. Pl.'s Am. Rev. Findings of Fact ¶ 53.

9. Representatives from Bennett reviewed and discussed the information contained in the due diligence binders with, Ms. Louis Smith, a representative from Abrams. Washburn Tr. at 11, 56; Smith Tr. at 77.

10. Pursuant to the Sale Notice, CoMed conducted the auction of Lots 1 and 2 on December 5, 2000. JPS ¶ 3. At the auction, representatives from Bennett, Midwest Medical Services, Inc., and Blackhawk Medical Transport, along with Mr. Thomas Wappel, an insider of the Debtor,

---

**3.** Transcript "68:15" here and similar references below refer to page and line(s) of testimony.

actively participated in the bidding process. JTE 4 ¶ B. Bennett ultimately submitted the highest and winning bid for Lots 1 and 2. Both Bennett and Daleyco are Illinois corporations. Bennett is the business of leasing ambulances and other related vehicles to the companies of Superior Air–Ground Ambulance Services, Inc. Compl. ¶ 5. Daleyco, in turn, provides emergency medical transportation services to municipalities and hospitals in the Chicago area and NorthWest Indiana. JPS ¶ 3.

11. The parties subsequently entered into separate asset purchase agreements ("Purchase Agreements") for the assets included in Lots 1 and 2 on December 12, 2000. Compl. ¶ 22; Answ. ¶ 22; JTE ¶ 4, 5.

12. The Purchase Agreement for sale Lot 1, the "South Side/Indiana Business Assets," consisted of (i) a series of executory contracts, (ii) vehicles and supplies, (iii) machinery and equipment that the Debtor used to provide emergency service its customers on the South Side and in the Suburbs of the City of Chicago and in Northwest Indiana, (iv) certain of the Debtor's accounts receivable, and (v) the Debtor's shares of its wholly owned subsidiaries DG & A, Inc. and Fagan Miller, Inc. JTE 3.

13. The Lot 1 Purchase Agreement also contained a schedule of executory contracts listing a month to month commercial lease from John W. & Betty J. Daley, Jr. for a dispatch center located at 1234 Sibley Blvd Dolton, Illinois. JPS ¶ 22, JTE 3.

14. Article II of the lease provided that the lease was to commence May 1, 1995 and end April 30, 2000. Pl.'s Ex. 14.

15. The Purchase Agreement for sale Lot 2, CoMed's "North Side Business Assets," consisted of (i) a series of executory contracts, (ii) vehicles and supplies, (iii) machinery and equipment that the Debtor used to provide emergency services on the North Side of Chicago, (iv) certain of the Debtor's accounts receivable, and (v) the Debtor's shares of a subsidiary named Tower Service, Inc.

16. The Lot 2 Purchase Agreement also included an accounts receivable for Medicare/Insurance with a ledger balance of $133,458.34 and Medicare/Medicaid with a ledger balance of $114,858,10. JTE 4.

17. Bennett agreed to pay CoMed $4,180,000 for the assets in Lot 1 and $1,920,000 for the assets in Lot 2 upon closing. JTE 3, 4. This Court approved the purchases through an agreed order signed by Bennett, CoMed, the Creditor's Committee and others. Order Approving Debtor's Sale of Assets Free and Clear of Liens and Encumbrances, December 12, 2000 ("Sale Order"), JPS ¶ 4. Bennett tendered these amounts on December 12, 2000. Compl. ¶ 38; Answ. ¶ 38.

18. Comed assumed and assigned the assets in Lots 1 and 2 to Bennett on December 12, 2000. JTE 6,7.

19. The Sale Order provided that "the assumption by the Debtor of the executory contracts and unexpired leases is approved as to each individual contract and lease upon the conditions that (a) the Purchaser or its nominee accepts an assignment of each contract and lease and assumes all pre-petition obligations at closing of curing any existing defaults, satisfying pecuniary damages, and rendering adequate assurance of performance and (b) the Purchaser or its nominee acquires the rights of the Debtor in each contract and lease at closing."

20. The Sale Order further provided for the pre-petition cure for pecuniary damages due and owing to John W. And Betty J. Daley for month to month lease for realty located at 1234 Sibley Boule-

vard, Dolton, IL in the amount of $318,000. JTE 5, 10.

21. After the December 12, 2000 closing CoMed received a letter dated December 18, 2000 from HCFA indicating that the agency would be suspending Medicare payments under 42 C.F.R. § 405.801 to CoMed and its predecessors for ambulance services furnished to Medicare beneficiaries from October 1, 1994 through December 31, 1996. Pl.'s Ex. 18. HCFA explained that it had determined that payments made to CoMed during the above period might be incorrect and that CoMed committed fraud and/or willful misrepresentation in claiming and obtaining payments. The suspended payments totaled approximately $119,658.70.

22. HCFA also stated that the agency would apply the suspended funds to recoup any calculated overpayments. The suspension commenced on December 18, 2000. Plaintiff's Exhibit 18. CoMed subsequently received a letter dated December 12, 2001 from the Department of Health and Human Services giving notice that the Centers for Medicare and Medicaid Services had decided to extend the suspension for an additional 365 days from December 13, 2001. Pl.'s Ex. 19.

23. HCFA further informed CoMed that it had the right to appeal any formal determination made by HCFA and provided details on the appeals process and applicable regulations. Plaintiff's Exhibit 18. However, there is no evidence in the trial record herein of either CoMed or Bennett contesting HCFA's decision through the administrative appeals procedure outlined in the letter.

24. In 1996, former employees of CoMed filed a *qui tam* action in the United States District Court for the Northern District of Illinois, Eastern Division captioned *United States ex rel. John Klaczak and Jeff Sharp v. Consolidated Medical Transportation, Inc. et al.*, Civil Action No. 96 C 6502, contending that the United States and various other parties had certain civil claims against CoMed under the False Claims Act, 31 U.S.C. §§ 3729–3733, for submitting or causing to be submitted false claims or false statements in support of false claims to Medicare and Medicaid. Their Amended Complaint was filed August 25, 2000. The United States joined that suit as a party by filing its own complaint on the same subjects on September 25, 2000.

25. In January 12, 2001 HCFA filed a proof of claim in CoMed's bankruptcy proceeding for approximately $27 million as a result of CoMed's alleged liability regarding Medicare and Medicaid.

26. After the sale parties subsequently settled the suit, with CoMed expressly denying any allegations, assertions, and contentions contained therein. Settlement Agreement ¶ H. The terms of settlement were included in CoMed's Chapter 11 plan that was confirmed on January 14, 2003. *See Order of Confirmation of the Unsecured Creditors Committee Third Amended Plan of Liquidation, January 14, 2003.* The settlement did not effect HCFA's decision to suspend payments. *Settlement Agreement of United States of America et al. and The Official Committee of Unsecured Creditors of Consolidated Medical Services, Inc, January 7, 2003.*

27. Facts set forth in the Conclusions of Law will stand as additional Findings of Fact.

## CONCLUSIONS OF LAW

### JURISDICTION

A bankruptcy court maintains jurisdiction to interpret its orders. *Oakfabco, Inc. v. Am. Std., Inc. (In re Kewanee Boiler),* 297 B.R. 720, 728 (Bankr.N.D.Ill.

2003). Breach of contract actions arising out of a post-petition contract approved in bankruptcy are core matters that can be heard and decided by a bankruptcy judge pursuant to 28 U.S.C. § 157(b)(2)(A). *Light Mfg. Company v. The Insurance Company of the State of Penn. (In re Ben Cooper Inc.)*, 896 F.2d 1394, 1400 (2d Cir. 1990); *In re Arnold Print Works, Inc.*, 815 F.2d 165, 168 (1st Cir.1987). Thus, core jurisdiction lies here over the present dispute under 28 U.S.C. §§ 1334 and 157(b)(2)(A) and the standing referral order under District Court Internal Operating Procedure 15(a). Venue lies here under 28 U.S.C. § 1409(a).

■ A special point should be discussed as to Count I, the medicare issue. Congress has mandated that judicial review of Medicare reimbursement disputes is available only after a party has exhausted administrative remedies. *Homewood Professional Center, Ltd. v. Heckler*, 764 F.2d 1242, 1247 (7th Cir.1985) (characterizing *Weinberger v. Salfi*, 422 U.S. 749, 757–758, 95 S.Ct. 2457, 45 L.Ed.2d 522 (1975) as holding that administrative exhaustion is a condition precedent to obtaining federal jurisdiction.) Under Title 42 U.S.C. § 405(h)[4] of the Social Security Act (made applicable to the Medicare Act by 42 U.S.C. § 1395ii and 42 U.S.C. § 1395oo(f)(1)) the findings and decision of U.S. Department of Health and Human Services are binding and no decisions are reviewable by the courts except after administrative exhaustion and a final decision provided for in 42 U.S.C. § 405(g)(h).

Section 405 is therefore a bar to subject matter jurisdiction over Medicare accounting disputes decided by the federal agency. Parties must exhaust their legal remedies before they can sue if the claim "arises under" the Medicare Act. *Shalala v. Illinois Council on Long Term Care, Inc.*, 529 U.S. 1, 120 S.Ct. 1084, 146 L.Ed.2d 1 (2000); *Homewood*, 764 F.2d 1242 (7th Cir.1985). However, that requirement only applies where the issue as to HCFA's suspension of payments to the Medicare accounts receivable "arises under" the Medicare Act.

■ The term "arises under" is to be interpreted broadly as including claims that are "inextricably intertwined" with benefits determinations under the Medicare Act. *Heckler v. Ringer*, 466 U.S. 602, 615, 104 S.Ct. 2013, 80 L.Ed.2d 622 (1984). Under *Homewood*, 764 F.2d at 1248, a cause of action arises under the Act if the action is an effort to expedite the recovery of payments or questions the constitutionality of the Department of Health and Human Services ("HHS") procedures relating to payments. Similarly, claims for reimbursement arise under the Medicare Act. *See Ancillary Affiliated Health Services, Inc. v. Shalala*, 165 F.3d 1069 (7th Cir.1998); *Home Comp Care v. United States HHS (In re Home Comp Care)*, 221 B.R. 202, 206 (N.D.Ill.1998) ("Appellant is disputing the withholding of Medicare reimbursement by appellees and claiming that appellees are not following proper procedures for withholding. Such a claim for wrongful withholding is essentially a request for payment.")

---

**4.** 402(h) states "Finality of Commissioner's decision. The findings and decisions of the Commissioner of Social Security after a hearing shall be binding upon all individuals who were parties to such hearing. No findings of fact or decision of the Commissioner of Social Security shall be reviewed by any person, tribunal, or governmental agency except as herein provided. No action against the United States, the Commissioner of Social Security, or any officer or employee thereof shall be brought under section 1331 or 1346 of title 28, United States Code [28 USCS § 1331 or 1346], to recover on any claim arising under this title [42 USCS §§ 401 et seq.]."

In this case, however, adjudication by this Court of issues involving property belonging to the estate does not directly implicate any substantive area of Medicare law or any administrative decision. The fairness or legality of any agency decision is not at issue. Neither party disputes in this forum the validity of Medicare's statutory right to withhold payment, nor has either party suggested a defect in HHS's or HCFA's procedures. Nor have the parties asked this Court to quantify the amount of future liability one of them might have to pay. This dispute is purely between two private parties to determine the responsibility between them for a future liability. Any effect on the administrative decisions is indirect and ancillary. Thus, this opinion is not a "judicial review" of any administrative decision within the meaning of the statute. *See In re Healthback, L.L.C.*, 226 B.R. 464, 471 (Bankr.W.D.Okla.1998) (holding that matters related to the bankruptcy estate do not constitute illegal interference in the administrative process amounting to judicial review.) Accordingly, § 405 in no way bars exercise of jurisdiction here.

## LIABILITY FOR THE MEDICARE ACCOUNTS RECEIVABLES

*01 A 00458 (Count I) and 02 A 00210 (Counterclaim Count I)*

The Purchase Agreements provide that provisions will be construed and governed under Illinois law. The elements for breach of contract in Illinois are "(1) the existence of a valid and enforceable contract; (2) performance by the plaintiff; (3) breach of the contract by the defendant; and (4) resultant injury to the plaintiff." *Nielsen v. United Services Auto. Ass'n*, 244 Ill.App.3d 658, 662, 612 N.E.2d 526, 529, 183 Ill.Dec. 874 (1993). Neither party has raised an issue of contract formation, performance or injury.

Bennett asserts that CoMed breached the Purchase Agreement by: (i) causing Medicare to have a claim against the CoMed Medicare Accounts receivable, violating Agreement § 1.1.; (ii) causing an obligation or liability relating to any federal state or local regulatory authority to be assumed by Bennett, violating § 2.3.5 of the Purchase Agreements; (iii) causing an obligation or liability arising under a contract or agreement, violating § 2.3.8; and (iv) causing a liability arising from pending, threatened or actual litigation, violating § 2.3.9. Compl. ¶ 50.

The threshold issue is whether the Purchase Agreements contained warranties or representations excluding CoMed from liability for actions related to the Medicare accounts receivables in Lot 2. Bennett characterizes the purchase agreements as creating unambiguous warranties promising that the purchased assets were free and clear of any liens, claims and encumbrances. The suspension of payment by the government constitutes a claim or other liability covered under the Purchase Agreements. Pl.'s Am. Post–Trial Brief at 4.

According to CoMed, the Purchase Agreements did not contain true warranty provisions, but were merely disclaimers wherein Bennett announced to the rest of the world that it would not be liable for certain obligations of the Debtor. Debtor–Def.'s Post–Trial Brief at 12.

In the alternative, Comed contends that even if provisions of the Purchase Agreement are construed as warranties, there was no breach. First, the bankruptcy Sale Order approving the Bennett asset purchase assertedly insulated CoMed from future liability arising out of the sale. Debtor–Def.'s Post–Trial Brief at 3–4. Sentence 2 of the Sale Order stated that "... the sale of the Purchase Assets to

Bennett free and clear of all Interests pursuant to the terms of the Agreement is authorized and approved." Sentence 4 provided "[a]ll Interests in and to the Purchased Assets will attach to the proceeds of the sale of the Purchased Assets with the same extent, validity and priority as same attached to the Purchased Assets on the date of the hearing on the Motion." *Order Approving Debtor's Sale of Assets Free and Clear of Liens and Encumbrances, December 12, 2000.* CoMed construes this language as creating two conditions; (1) a declaration that the assets, including the Medicare accounts, were purchased free and clear of any interests; and (2) that the declaration superseded any warranties in the Purchase Agreements and created a condition precedent to Bennett's obligation to purchase the assets. Debtor–Def.'s Post–Trial Brief at 3–4.

Second, CoMed argues that there was no breach because HCFA's suspension of payments, however characterized, was not covered by the Purchase Agreements. If this suit is a claim, that claim attached to the sale proceeds. If this action is not a claim, then the warranty does not apply to the government's refusal to pay the Medicare Receivable. Debtor–Def.'s Post–Trial Brief at 7. Lastly, CoMed says that there was no breach because Bennett had notice of the Medicare claim and made a calculated business decision to ignore the claim and assume liability. Debtor–Def.'s Post–Trial Brief at 16–19.

■ As the parties' characterizations illustrate, the case turns on contract interpretation. Traditional contract principles in Illinois require that "an agreement, when reduced to writing must be presumed to speak the intention of the parties who signed it. It speaks for itself, and the intention with which it was executed must be determined from the language used."

*Air Safety, Inc. v. Teachers Realty Corp.,* 185 Ill.2d 457, 462, 236 Ill.Dec. 8, 706 N.E.2d 882, 884 (1999).

■ Where there is evidence of ambiguity in the agreement between the parties, however, parol evidence may be used to explain the ambiguity. Ambiguity exists where the language of the contract is susceptible to more than one meaning. *Farm Credit Bank v. Whitlock,* 144 Ill.2d 440, 447, 163 Ill.Dec. 510, 581 N.E.2d 664 (1991).

■ Where ambiguity exists, the parol evidence rule may be used to allow extrinsic evidence to explain the terms of the contract. *LaSalle National Bank v. General Mills Restaurant Group, Inc.,* 854 F.2d 1050, 1051 (7th Cir.1988), though evidence of prior or contemporaneous agreements or negotiations may not be introduced to contradict the terms of a partially or completely integrated contract. *Merk v. Jewel Food Stores Div. Of Jewel Companies, Inc.,* 945 F.2d 889, 892 (7th Cir. 1991).

■ At trial, CoMed has offered extrinsic evidence to support its contention that it did not make any warranties in the Purchase Agreements. First, a Bill of Sale and Assignment Agreement were introduced providing that the transfer of assets would be by way of quit-claim:

"CoMed's transfer of property is by way of quit-claim. CoMed has made no representations or warranties of any kind or nature, express or implied, relating to the Assets. *All warranties, including those of quality, fitness for a particular purpose or in general, and merchantability are hereby excluded.*" [emphasis in original] Defendant's Trial Exhibits 31, 34, 35.

CoMed asserts that the quit-claim language proves that it did not make any warranties or representations in the Pur-

chase Agreements. Debtor–Def.'s Post–Trial Brief at 14–16.

Second, CoMed offered proof of discussions regarding the government's lawsuit between counsel for Bennett, CoMed, and HHS prior to the sale as evidence that it did not make any misrepresentations. Debtor–Def.'s Ex. 10, 24–27. CoMed also argues that it would not make bidders aware of a potential future liability and then sign a contract guaranteeing itself against retaining that liability. Debtor–Def.'s Post–Trial Proposed Conclusions of Law at 3–4.

Finally, CoMed's points to statements made in open court by its counsel in the presence of Bennett's counsel that "We sold without any representations or warranties. . . ." According to CoMed, failure of Bennett's counsel to object meant that the statement was accurate. Debtor–Def.'s Ex. 27.

None of that evidence or argument can vary express unambiguous term of the Purchase Agreements.

Relevant portions of the Asset Purchase Agreement read:

*Section 1.1* On the terms and subject to the conditions set forth in this Agreement, the Seller will sell, convey, transfer, assign and deliver to the Purchaser, and the Purchaser will purchase, acquire, and take assignment and delivery from the Seller at the Closing (as hereinafter defined), as is and where is, and free and clear of any and all liens, claims and encumbrances, except as otherwise provided in this Agreement, all of the right, title and interest of the Estate in and to the assets listed in Schedule 1.1.

*Section 2.3:* ". . . the Purchaser shall not assume or be liable for any of the following" (followed by Sections 2.3.5, 2.3.8 and 2.3.9).

*Sections 2.3.5* "[A]ny fine, penalties, liabilities and obligations of the Seller to or relating to any federal, state or local regulatory authorities, including the U.S. Occupational Safety and Health Administration and the U.S. Department of Labor."

*Sections 2.3.8* "[A]ny obligations or liabilities of the Seller arising under any contracts, agreements, leases, rental agreements, sales orders, sales contracts, supply contracts, contract proposals, purchase orders or purchase commitments, except as expressly set forth in Section 2.2. hereof."

*Sections 2.3.9* "[A]ny liabilities arising from any pending, threatened or actual litigation."

*Section 11.1* "[E]ach of the representations and warranties made by the parties in this Agreement or in any documents delivered at the Closing shall survive the closing."

These provisions specified that CoMed retained liability for any pre-closing breach related to the purchased assets. Section 1.1 served as an intention that the assets will be sold free and clear of claims. Section 2.3 provided that Bennett "shall not assume or be liable for any of the following," followed by other provisions stating that Bennett would not be liable for defined obligations or liabilities that necessarily included liabilities of the seller relating to medicare issues.

The Medicare Accounts receivable is part of an agreement entered into under Part B of the Medicare Act. Part B of the Medicare Act was established by Title XVIII of the Social Security Act, 42 U.S.C. § 1395 et seq., and in relevant part, provides for payment of ambulance services under proscribed conditions and establishes conditions of service. See 42 CFR §§ 410.40, 414.610. The Secretary of HHS administers the Medicare Program and

has delegated this function to HCFA, a component of HHS.

An ambulance provider satisfying these regulations may enter into a provider agreement with HCFA, 42 U.S.C. § 1395cc, and be reimbursed for the reasonable cost of covered services, as determined under detailed statutory and regulatory criteria. 42 U.S.C. §§ 1395f(b), 1395h, 1395x(v); 42 CFR § 413.1 et seq. HHS's payment scheme is determined by a national fee schedule for ambulance services. 42 C.F.R. §§ 414.610, 414.615, 414.620. After interim payments are made, audits are conducted that may reveal any under or overpayments made to providers. Such underpayment or overpayments are corrected through ongoing adjustments in subsequent Medicare reimbursements. 42 C.F.R. §§ 405.371(a)(2). HHS is allowed to adjust payments to providers as is necessary to properly balance payments to providers. 42 U.S.C. § 1395g(a). The review of the interim payments is conducted by a fiscal intermediary, generally a private insurance company. 42 C.F.R. § 413.20(b), 413.24(f). The suspension of the Medicare account receivables was not in the nature of a fine or penalty but was tantamount to an administrative audit which might give rise to a government claim of liability for repayment.

At the time of the sale, both former employees and the United States had brought litigation then pending to recover asserted overpayments.

Under the quoted contract provisions, CoMed retained responsibility and Bennett did not accept responsibility for any medicare repayments. CoMed's attempt

to confuse or change the clear meaning of terms in an integrated contract[5] must be and is rejected.

It is equally clear that the provisions above were not public disclaimers. Contracts are not declarations to the world, rather they represent specific agreements between the parties assigning risks and responsibilities in exchange for consideration.

▆▆▆ The above provisions, which excluded Bennett from certain liabilities, must be balanced against the following provisions, which sought to limit CoMed's liability.

*Section 4.5* "[E]xcept as is expressly set forth in this Agreement, the Seller makes and has made no representations or warranties of any kind or nature, express or implied, relating to the Purchase Assets, including NO WARRANTIES OF MERCHANTABILITY OR FITNESS FOR ANY PARTICULAR PURPOSE. ALL PURCHASED ASSETS ARE SOLD 'AS IS AND WHERE IS' AND 'WITH ALL FAULTS.' The Seller has not made, and is not willing to make, any representations or warranties as to the physical condition of the Purchased Assets, their contents, the income or commissions derived or potentially to be derived from the Purchased Assets or the Assumed Liabilities, or the expenses incurred or potentially to be incurred in connection with the Purchased Assets or the Assumed Liabilities. The Seller is not, and will not be, liable or bound in any manner by express or implied warranties, guarantees, statements, promises, representations or information pertaining to

---

5. The Purchase Agreement contains an integration clause in Section 11.6. "This instrument and the schedules attached hereto contain the entire agreement of the parties with respect tot he purchase of the Purchased As-

sets and the other transactions contemplated herein, and supersede all prior understandings and agreements of the parties with respect to the subject matter hereof."

the Purchased Assets or the Assumed Liabilities, made or furnished by any broker, agent employee, servant or other person representing or purporting to represent the Seller, unless such are expressly and specifically set forth herein" (Emphasis in the original).

CoMed reads Section 4.5 as a limitation on provisions referenced in Section 2. Debtor–Def.'s Post–Trial Brief at 10. Section 4.5 concerned the quality of the assets immediately before the auction sale. That provision uses terms that sellers routinely use when placing a product on the market. Under normal trade practices, these terms ("as is and where is," and "with all faults," and "fitness for a particular purpose") limit the liability of the seller for defects in the product being offered. Accordingly, a more appropriate reading of Section 4.5 is that the concepts of merchantability[6] are disclaimed in that provision, but Section 4.5 does not specifically or by implication relieve CoMed of its obligations under Section 2 of the Agreement.

CoMed's alternative arguments will now be examined.

*Whether the Sale Order relieves CoMed of Liability from the Asset Purchase Agreement*

■ CoMed contention that the Sale Order absolves it of liability is misplaced. The Sale Order reads, in pertinent part:

3. The sale of the Purchased Assets to Bennett free and clear of all Interests pursuant to the terms of the Agreement is authorized and approved.

4. All Interests in and to the Purchased Assets will attach to the proceeds of the sale of the Purchased Assets with the same extent, validity and priority as same attached to the Pur-

chased Assets on the date of the hearing of the Motion.

The provisions of the Sale Order indicates that the Order was not crafting new rights between the parties but was approving terms of the Purchase Agreement. Paragraph 3 expressly subordinates the phrase "free and clear" to the "terms of the Purchase Agreement" thereby establishing that the Purchase Agreements, not the Sale Order, controls the rights of the parties. Paragraph 4 states that existing interests in the assets such as liens would attach to proceeds of the sale. It did not modify or abrogate the rights of the parties contained in the Purchase Agreement.

Moreover, these Adversary proceedings are not collateral attacks on the Sale Order, as CoMed argues. Debtor–Def.'s Post–Trial Brief at 2. The Plaintiffs are asserting breach of contract claims associated with the sale of assets, not requests to set aside the Sale Order or vacate its provisions.

*Whether the Government's Pending Recoupment Action was Covered by the Purchase Agreement*

CoMed asserts that an action for recoupment is not a bankruptcy claim for purposes of a an asset sale under 11 U.S.C. § 363. It cites *In re Stoecker*, 5 F.3d 1022 (7th Cir.1993) for the proposition that a claim does not include a defense and cites authority from other Circuits holding that the right to recoupment is a defense and not a claim.

Because CoMed assumed liability for much more than bankruptcy claims in the Purchase Agreements, this argument cannot prevail. CoMed also assumed liability for liabilities and obligations to any federal regulatory authorities, any obligations or

---

**6.** By definition, merchantability relates to fitness for sale. Black's Law Dictionary (7th ed.1999)

liabilities arising under any contracts, agreements, and any liabilities arising from any pending, threatened or actual litigation. JTE Ex. 5, Purchase Agreement Sections 2.2, 2.3.5, 2.3.8 and 2.3.9. Even assuming *arguendo* that an action for recoupment is not a bankruptcy "claim," that point does not control this case, since CoMed's retention of liability under provisions of Section 2 encompassed the Medicare liabilities in issue here.

*Whether Notice of the Medicare Claim meant that Bennett Assumed Liability*

■ CoMed asserts that Bennet had notice of the government's recoupment action prior to the auction and, despite this knowledge, made a deliberate business decision to purchase the Medicare accounts receivables. As support, CoMed points to information contained in the due diligence binders reviewed by prospective bidders. The first piece of evidence is contained in a footnote to an audit report showing that "[t]he company is under investigation by the U.S. government for potential fraudulent billing practices." The second piece of evidence stated that management believed that the breathing space allowed by the Chapter 11 filing would allow the debtor to present a compromise to the United States and private relators in the dispute concerning the debtor's 1996 Medicare income and related matters. Debtor–Def.'s Post–Trial Brief at 16–17. CoMed argues that no reasonable business entity exercising due diligence would overlook this information.

Principles of contract interpretation, however, limit this Court's analysis solely to the contract between the parties. There is nothing in the Purchase Agreements which states or suggests that notice of a potential liability supplants the provisions contained in Section 2. Indeed, those provisions would likely be required by a rational buyer fully aware of major potential liabilities in pending litigation, and disclosures of the litigation cannot eliminate the effect of those provisions under which the burden of litigation liability was retained by CoMed.

Judgment will therefore enter in favor of Bennett in Count I in 01 A 00458 and in Count I of the Counterclaim in 02 A 00458.

### THE SIBLEY LEASE

*01 A 00458 Count II and 02 A 00210 Counterclaim Count II*

■ The parties do not dispute that the Sibley lease had run past its stated terms and expired by its terms before closing of the asset sale and assignment of the lease to Bennett. This fact forms the basis of Bennett's deceptively simple attack on validity of the lease assignment: that a facially expired lease cannot be assumed and assigned under 11 U.S.C. § 365, and therefore (1) as a matter of law a cure payment is not required and (2) by including the Sibley lease in a listing of executory contracts, CoMed misrepresented viability of the lease. However, for reasons explained below, it is held that the Sibley lease was properly assumed and assigned under 11 U.S.C. § 365.

Section 365 provides that "the trustee, subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor." Authority to assume unexpired leases is extended to debtors in possession in Chapter 11 cases under 11 USC § 1107.

■ The key term at issue is "unexpired." Section § 365 excludes expired leases from the assumption powers. Nevertheless state law, rather than § 365 of the Bankruptcy Code, determines what constitutes an unexpired lease. *Robinson v. Chicago Housing Authority*, 54 F.3d 316 (7th Cir.1995) ("the federal law allowing

unexpired leases to be assumed calls for a determination whether a lease has ended under state law.")

In Illinois a lease gives rise to the relationship of landlord and tenant. "It is a type of contract and, as such, it is governed by rules which govern contracts generally." *Midland Mgmt. Co. v. Helgason*, 158 Ill.2d 98, 630 N.E.2d 836, 196 Ill.Dec. 671 (Ill.1994). The "... principle function of the Court in construing a lease is to give effect to the intention of the parties as expressed in the language of the document when read as a whole." *Id.*

When analyzing whether a lease has ended, it is true under Illinois law that the first question is whether the lease has ended by its own terms, *In re Williams*, 144 F.3d 544 (7th Cir.1998), and CoMed's lease expired on April 30, 2000, eight months before the auction. But the inquiry does not end there. In *Robinson*, a Seventh Circuit panel held that the general rule in Illinois is that a lease ends when the tenant is no longer entitled to possession. *Id.* at 321. In that case, the debtor filed for Chapter 13 bankruptcy protection weeks after her landlord, the Chicago Housing Authority ("CHA"), served her with notice of termination and secured a judgment of possession in state court. *Id.* at 317. The debtor asked her trustee to assume her lease as part of her Chapter 13 reorganization plan. CHA subsequently sought leave to enforce its judgment through relief from the automatic stay. The specific issue decided was whether under Illinois law there is distinction between a terminated lease and an expired lease. In answering that question, the opinion set forth a number of rulings that guide the decision here.

*Robinson* first enunciated a two-part test for determining when a tenant's right to possession ended: The landlord must first have taken all the necessary procedural steps to repossess the premises. Second, termination can only take place after the tenant no longer has recourse to revive the lease. The opinion then outlined five steps in the process of evicting a tenant under the Illinois statute required to terminate a tenant's rights. The first step is that the tenant must be delinquent in their rent. Second, the landlord must notify the tenant, in writing, that the rent must be paid within no less than five days. Third, the specified time period mentioned in the notice must pass without tender of payment by the tenant. Fourth, the landlord must sue for possession and obtain a judgment for possession. Fifth, and finally, a writ of possession issues pursuant to the judgment for possession. *Robinson* held that a tenant no longer retains a right to possession once a judgment of possession has been entered. *Id.* at 322 ("At this fourth step in the eviction process a landlord has surely taken the steps requisite for termination.") *Robinson*, 54 F.3d at 321 (holding that lease did not terminate in a legal sense unless and "until all the essential procedural steps have been taken and the tenant no longer has legal recourse to revive the lease.").

It is abundantly clear, therefore, that a tenant continues to have some interest in a lease well beyond the term expiration date. Under *Robinson*, a lease is not "unexpired" under § 365 until the landlord has taken affirmative procedural steps to terminate and the tenant has exhausted any legal defenses. But either of those steps may occur significantly beyond the document's expiration date.

Even after the landlord initiates legal process to terminate the lease, tenancy is not automatically terminated. A landlord may waive its rights. *See In re Finkley*, 203 B.R. 95, 101 (Bankr.N.D.Ill.1996) (after giving notice, the landlord may still consider the lease in effect and require the

tenant to comply with all of its terms.); and *Jefferys v. Hart,* 197 Ill.App. 514 (1916) ("it is the privilege of the landlord to say whether or not the lease is terminated."). *Accord, see In re Finkley,* 203 B.R. 95 (Bankr.N.D.Ill.1996); *In re Brown,* 1995 Bankr.LEXIS 2104 (holding that the lease does not terminate when the landlord files suit for possession.).

Indeed, a debtor may revive an expired lease by prevailing in a forcible proceeding. As the opinion in *Finkley* observed, after a landlord files an action seeking possession of property for default in rent, alleging proper demand and failure of the debtor to pay within the period specified by the demand, the debtor might respond (a) that no rent was ever in default, (b) that the landlord did not properly serve a required notice, (c) that the tenant did tender payment of the amount demanded, or (d) that the landlord had waived the default. If the tenant prevailed on any of these issues, a court would find that the lease was not terminated. *Finkley Id.* at 102. Until the steps set forth in *Robinson* are completed, a lease may be assumed and assigned in bankruptcy under 11 U.S.C. § 365.

The contract date of expiration is not irrelevant. The expiration date may in fact justify the process in *Robinson,* i.e. the commencement of legal proceedings by either the landlord or the tenant. But the expiration date does not by itself serve as a complete and total severance of the leasehold right. An expired lease does not by itself terminate possession rights and it is this possessory right, whether labeled a tenancy in common, holdover tenancy, or tenancy in sufferance or otherwise, that may be assumed and assigned.

In this case, the landlords under for the Sibley lease have not initiated legal proceedings to terminate the lease. Nor did the landlords, as required under Illinois law, serve any party with notice of termination or maintained an action for ejectment. In fact, they have expressed their desire for the lease to continue:

> "[u]nder the terms of the lease, which expired on April 30, 2000, we have the right ... to charge the tenant 200% rent during the holdover period after lease termination. However, we believe it is in the best interests of both the tenant and ourselves ... to waive our right to charge 200% rent during the holdover period. Please let this letter serve as that waiver." John W. Daley, Jr. and Betty Daley and Brian T. Witek and Richard S. Witek's Affidavits, stipulated as authentic, Debtor–Def.'s Ex. 6.

Since the Sibley lease had not terminated under Illinois law, it was properly assumed and assigned under 11 U.S.C. § 365.

Bennett's misrepresentation argument as to the lease suffers from other significant defects. First, CoMed made the lease available for review before the auction date. Bennett is a sophisticated party and had ample time to examine the lease provisions and seek the advice of counsel.

Second, Bennett did not establish any evidence of fraud or misrepresentation at trial. Bennett's witnesses testified (1) that they did not discuss the lease with representatives from Abrams, (2) that they believed a Court order approving the sale required the cure payment and (3) the lease was described as current in various court proceedings. But the evidence showed no false or fraudulent statement by any representative from CoMed or its agent Abrams. Remarkably, Washburn admitted on cross-examination that no one from CoMed ever said anything false about the lease. Washburn Tr. at 26. Despite ample opportunity and full disclosure of the lease document, Bennett never objected to the bid procedures or the order approving the asset sale. Instead, Ben-

nett actively participated through counsel in the process leading up to and including the auction. With respect to the Sibley lease, the burden of due diligence and burden to raise any objection was on Bennett. CoMed did not misrepresent the nature of the lease and prevails as to Complaint Count II and Counterclaim Count II.

Finally, CoMed's arguments that the doctrines of res judicata and judicial estoppel preclude the proceedings here has been rejected in an earlier opinion. *Bennett Three Leasing Svcs., Inc. v. Consolidated Medical Transport (In re Consolidated Medical Transport)*, 280 B.R. 633 (Bankr.N.D.Ill.2002).

### CONCLUSION

Judgement will separately enter for the Plaintiff as to Count I of Adversary 01 A 00458 and Count I of the counter-complaint in Adversary 02 A 00210 and for the Debtor–Defendant as to Count II of Adversary 01 A 00458 and Count II of the counter-complaint in Adversary 02 A 00210.