(No. 75195

# MIDLAND MANAGEMENT COMPANY, Appellant, v. RONALD HELGASON, Appellee.

*Opinion filed January 20, 1994.*

HEIPLE, J., joined by HARRISON, J., dissenting.

Sanford Kahn, Ltd., of Chicago (Richard W. Christoff, of counsel), for appellant.

Terrence McKeown and Sarah Megan, of St. Charles, and Gerald Brask, Jr., of Rockford, all of Prairie State Legal Services, Inc., for appellee.

JUSTICE FREEMAN delivered the opinion of the court:

Plaintiff, Midland Management Company (Midland), as landlord, appeals from the appellate court's affirmance of the circuit court of Kane County's determination that Midland waived its right to assert a forcible entry and detainer action by accepting Federal housing assistance payments, made on behalf of defendant, Ronald Helgason.

## FACTS

Defendant entered into a written lease agreement

with Midland for the lease of a residential unit at Harbor Village Apartments in Aurora. Defendant's tenancy was subsidized under section 8 of the United States Housing Act of 1937 (Section 8) (42 U.S.C. § 8 (1991)). As a result of the subsidy, defendant was required to pay a total monthly rent amount of $6. The remainder of the fair market rent value for the unit was to be paid under Section 8 in the form of a housing assistance payment.

Pursuant to the lease agreement, defendant, as tenant, agreed to pay the costs of repairs for damage to the property resulting from his carelessness, misuse or neglect. On April 3, 1991, Midland served defendant with a demand for reimbursement for the repair of defendant's water-damaged floor. Defendant refused the demand and, subsequently, tendered his $6 monthly rental payment to Midland.

On May 15, 1991, Midland served defendant with notice of termination of the tenancy for failure to reimburse for the water-damage repair and also returned defendant's rent. Midland, however, continued to receive Section 8 housing assistance payments through August 1991.

When defendant failed to vacate the leasehold pursuant to the termination notice, Midland brought an action in forcible entry and detainer. (Ill. Rev. Stat. 1991, ch. 110, par. 9—101 *et seq.*) The trial court entered judgment for Midland, and awarded it possession, damages, and costs. Subsequently, however, the trial court granted defendant's motion to vacate the judgment, ruling that, *inter alia*, Midland's continued acceptance of the housing assistance payments subsequent to serving notice of termination of the tenancy constituted waiver of the breach of the lease as a matter of law.

The appellate court affirmed (241 Ill. App. 3d 899), and we granted Midland's petition for leave to appeal (134 Ill. 2d R. 315(a)). We now reverse that decision.

## SECTION 8

Prior to our discussion, we deem it necessary to discuss the nature of the Section 8 rent subsidy program and housing assistance payments. Section 8 is a Federal housing subsidy program administered by the United States Department of Housing and Urban Development (HUD). (42 U.S.C. § 1437f (1991).) Section 1437f(a) provides, in pertinent part:

> "For the purpose of aiding low-income families in obtaining a decent place to live and of promoting economically mixed housing, assistance payments may be made with respect to existing housing ***." (42 U.S.C. § 1437f(a) (1991).)

To that end, HUD is authorized to enter into housing assistance payment contracts with owners of housing in which some or all of the units shall be available for occupancy by low-income families. See 42 U.S.C. § 1437f(b) (1991).

Housing assistance payment contracts establish the maximum monthly rent which the owner is "*entitled*" to receive for each dwelling unit with respect to which such "*housing assistance payments*" are to be made. (Emphasis added.) (42 U.S.C. § 1437f(c)(1) (1991).) Pursuant to the Code, the assistance contract shall provide that assistance payments may be made only with respect to a dwelling unit under lease for occupancy by a family found to be a low-income family at the time it initially occupied such dwelling unit. However, vacancy payments may be made with respect to unoccupied units for a period not exceeding 60 days in the event that a family vacates a dwelling unit before the expiration date of the lease for occupancy *or* where a good-faith effort is being made to fill an unoccupied unit. 42 U.S.C. § 1437f(4) (1991).

For Section 8 purposes, HUD utilizes a formula to determine the rental value of a housing unit based upon a fair market rental value in the nonsubsidized housing

market. (42 U.S.C. § 1437f(c)(1) (1991).) A tenant eligible to participate in the Section 8 program pays a portion of the market rental value, or rent, based upon his income. (See 42 U.S.C. § 1437a(a)(1) (1991); *East Lake Management & Development Corp. v. Irvin* (1990), 195 Ill. App. 3d 196, 199.) The amount of the monthly assistance payment is the difference between the maximum monthly rent which the contract provides that the owner is to receive for the unit and the rent the family is required to pay under section 1437a(a). 42 U.S.C. § 1437f(3)(A) (1991); *East Lake Management*, 195 Ill. App. 3d at 199.

## DISCUSSION

The singular issue which we decide is whether Midland's acceptance of Section 8 housing assistance payments resulted in a waiver of its right to forfeiture of the lease.

It has long been established that any act of a landlord which affirms the existence of a lease and recognizes a tenant as his lessee after the landlord has knowledge of a breach of lease results in the landlord's waiving his right to forfeiture of the lease. (*Vintaloro v. Pappas* (1923), 310 Ill. 115, 117.) Simply put, evidence of acts inconsistent with a declaration of a termination of the lease may prove waiver of the breach, which operates to reinstate the lease. (See *Simmons v. Berryman* (1930), 342 Ill. 274, 278.) Acceptance of rent accruing subsequent to a breach is one such inconsistent act. (See *Weiss v. Johnson* (1963), 28 Ill. 2d 259, 261.) It is immaterial by whom the rent is paid if it is received *as rent* and on behalf of the lessee. 51C C.J.S. *Landlord & Tenant* § 117(4) (1968).

Defendant contends that the appellate court correctly held that Section 8 housing assistance payments constitute rent, the continued acceptance of which

resulted in a waiver of Midland's right to forfeiture. We note that our appellate court, sitting in the first district, has held otherwise. See *East Lake Management & Development Corp. v. Irvin* (1990), 195 Ill. App. 3d 196.

We agree, for various reasons, with the decision in *East Lake Management* that the assistance payments do not constitute rent. The most compelling of these reasons is our construction of the lease agreement between Midland and defendant. (*Cf. National Corp. for Housing Partnerships v. Chapman* (1984), 18 Ohio App. 3d 104, 481 N.E.2d 654 (in determining that housing assistance payment was not rent, court examined terms of landlord/tenant agreement and also determined that because assistance was not personal to tenant, it was not rent).) Significantly, HUD is not a party to the lease agreement, and, incidentally, there is no contention that defendant is a party to the housing assistance payment contract between HUD and Midland.

A lease is an agreement which gives rise to the relationship of landlord and tenant. (24 Ill. L. & Prac. *Landlord & Tenant* § 2 (1980).) It is essentially a type of contract (*Illinois Central R.R. Co. v. Michigan Central R.R. Co.* (1958), 18 Ill. App. 2d 462, 484), and, as such, it is governed by the rules which govern contracts generally (*Design Studio International, Inc. v. Chicago Title & Trust Co.* (1989), 185 Ill. App. 3d 797, 802; 51C C.J.S. *Landlord & Tenant* § 202(2) (1969)). "[W]herever there is a contract its terms must control the rights of the parties." (*Fichter v. Milk Wagon Drivers' Union, Local 753* (1943), 382 Ill. 91, 100.) Thus, we believe that regardless of our characterization of the housing assistance payment, the rights and obligations of defendant and Midland are controlled by the terms of their agreement. Conceivably, even if such payments constitute rent, parties entering into a lease agreement would, nonetheless, be free to agree on the effect of the

landlord's acceptance of such payments after a tenant's breach.

The principal function of the court in construing a lease is to give effect to the intention of the parties as expressed in the language of the document when read as a whole. (See *Dix Mutual Insurance Co. v. LaFramboise* (1992), 149 Ill. 2d 314, 320.) Relevant to disposition of the issue now before us is whether the parties intended that housing assistance payments constitute rent. We note that the lease agreement included in the record recites neither the most current term of the lease nor the most current rent amount. However, the agreement was admitted, without objection, into evidence as representative of the agreement between the parties.

The clause in the lease concerning rent provides that defendant, as the tenant, agrees to pay a sum certain amount for rent per month. The clause also provides:

> "The Tenant understands that his monthly rent is less than the market (unsubsidized) rent due on this unit. This lower rent is available either because the mortgage on this project is subsidized by the Department of Housing and Urban Development (HUD) and/or because HUD makes monthly payments to the Landlord on behalf of the Tenant. The amount, if any, that HUD makes available monthly on behalf of the Tenant is called the tenant assistance payment and is shown on the ' "Assistance Payment" ' line of the Certification and Recertification of Tenant Eligibility Form which is Attachment No. 1 to this Agreement."

The lease further provides that the landlord may terminate the agreement for nonpayment of rent. In that regard, we note that no similar remedy is available to Midland in the event of nonreceipt of the housing assistance payment.

Nowhere in the lease agreement is the housing assistance payment defined or referred to as rent. It is simply characterized as a separate payment made on behalf of the tenant in the form of a tenant assistance payment. Under the terms of the agreement between defendant and Midland, rent is the monthly dollar amount tendered by defendant to Midland in consideration of the lease. Under the terms of the lease, the housing assistance payment was not received as rent. Thus, Midland's acceptance of such payments did not operate to waive forfeiture of breach.

Our conclusion with respect to the assistance payments may be supported on yet another basis. Rent is given in consideration of a lease. As we have already stated, a lease gives rise to the landlord-tenant relationship. In order to establish the relation of landlord and tenant, the possession and control or the right thereto of the property must pass to the tenant. (24 Ill. L. & Prac. *Landlord & Tenant* § 3 (1980); 51C C.J.S. *Landlord & Tenant* § 2(2) (1968).) No such relationship is created between HUD and the owner of property. Significantly, HUD is not a party to the lease agreement, and it does not appear from the lease that HUD acquired any possessory interest in the property.

The housing assistance payment contract has not been provided as part of the record. However, based upon our review of the statutory provisions concerning such contracts, we believe that such contracts have as their purpose to make non-low-income housing available to low-income families, thereby achieving HUD's goal of economically mixed housing. Although the housing assistance payment is equal to some portion of the fair market rent to which the landlord is entitled, that fact does not define the nature of the payment as rent. In the most traditional sense, "[r]ent is the return made to the lessor by the lessee for his *use* of the land." (Emphasis added.) (*Automobile Supply Co. v. Scene-In-Action*

*Corp.* (1930), 340 Ill. 196, 200; *Cottrell v. Gerson* (1939), 371 Ill. 174, 181.) It is the tenant, not HUD, who has the use of the land.

Further, we believe it significant that when a subsidized housing unit becomes vacant following the owner's eviction of an eligible tenant, under the terms of the housing assistance payment contract, the landlord is entitled to continue to receive vacancy payments for a period of 60 days or more upon a showing that he is actively seeking to fill the vacancy with another Section 8 eligible tenant. (See 42 U.S.C. § 1437f(4) (1991).) This suggests to us that the housing assistance payment flows with the rental unit, and not the Section 8 tenant. Thus, the housing assistance payment contract, unlike a lease, survives the landlord-tenant relationship.

Finally, we do not believe that HUD intended that housing assistance payments be considered rent. To characterize the assistance as such would effectively defeat HUD's interest in the development and availability of economically mixed housing for low-income families. As a practical matter, landlords confronted with the possibility of forfeiture of breach for the acceptance of housing assistance payments would be less apt to open their doors to low-income families and would seek to fill their vacancies with non-rent-assisted families. But see *Greenwich Gardens Associates v. Pitt* (1984), 126 Misc. 2d 947, 484 N.Y.S.2d 439 (holding that intent of legislature was that assistance be considered rent because, *inter alia*, contract rent, as defined in 24 C.F.R. § 880.201 (1993), is the total amount of rent specified in the contract as payable by HUD and the tenant to the owner for an assisted unit).

We conclude that under the terms of the lease agreement, Section 8 housing assistance payments did not constitute rent. Thus, Midland's continued acceptance of such payments did not effect a waiver of breach of the lease.

We note that defendant raises two arguments: (1) whether Midland failed to meet its burden of proof as required under Federal housing regulations and the terms of the lease, and (2) whether Midland established sufficient cause to terminate the tenancy.

These issues were presented in the appellate court and resolved in favor of Midland. Reconsideration by this court would yield no different result. We therefore decline further review.

## CONCLUSION

For all the forgoing reasons, we reverse the judgments of the appellate and circuit courts and remand the cause to the circuit court for further proceedings.

*Judgments reversed; cause remanded.*

JUSTICE HEIPLE, dissenting:

This case illustrates the resourcefulness of the judicial mind when confronted with the application of a rule of law which produces a result deemed to be undesirable. The straightforward approach to such a dilemma offers but two possibilities. The first option is to apply the law to the case and let the painful result occur. The second option, available to a court of last resort at least, is to change the rule of law. Make a new one. However, if neither of these two options is attractive, the resourceful judicial mind has yet a third option. It can redefine the terms so that the rule does not apply to the case at hand. This approach was chosen by the majority in the instant case.

The application of this technique is well illustrated and perhaps reached its zenith in the Canadian case of *Regina v. Ojibway*, 8 Criminal Law Quarterly 137 (Toronto, 1965) in an opinion rendered by Blue, J. The case was an appeal by the Crown by way of a stated case from a decision of the magistrate acquitting the accused

of a charge under the Small Birds Act, R.S.O. 1960, c. 724, § 2. The facts were not in dispute. The opinion is set out here *in haec verba*:

"Fred Ojibway, an Indian, was riding his pony through Queen's Park on January 2, 1965. Being impoverished, and having been forced to pledge his saddle, he substituted a downy pillow in lieu of the said saddle. On this particular day the accused's misfortune was further heightened by the circumstance of his pony breaking its right foreleg. In accord with Indian custom, the accused then shot the pony to to relieve it of its awkwardness.

The accused was then charged with having breached the Small Birds Act, s. 2 of which states:

'Anyone maiming, injuring or killing small birds is guilty of an offense and subject to a fine not in excess of two hundred dollars.'

The learned magistrate acquitted the accused, holding in fact, that he had killed his horse and not a small bird. With respect I cannot agree.

In Light of the definition section my course is quite clear. Section 1 defines 'bird' as a 'two legged animal covered with feathers.' There can be no doubt that this case is covered by this section.

Counsel for the accused made several ingenious arguments to which, in fairness, I must address myself. He submitted that the evidence of the expert clearly concluded that the animal in question was a pony and not a bird, but this is not the issue. We are not interested in whether the animal in question is a bird or not, in fact, but whether it is one in law. Statutory interpretation has forced many a horse to eat birdseed for the rest of its life.

Counsel also contended that the neighing noise emitted by the animal could not possibly be produced by a bird. With respect the sounds emitted by an animal are irrelevant to its nature, for a bird is no less a bird because it is silent.

Counsel for the accused also argued that since there was evidence to show accused had ridden the animal, this pointed to the fact that it could not be a bird but was actually a pony. Obviously, this avoids the issue. The issue is not whether the animal was ridden or not, but whether

it was shot or not, for to ride a pony or a bird is no offense at all. I believe that counsel now sees his mistake.

Counsel contends that the iron shoes found on the animal decisively disqualify it from being a bird. I must inform counsel, however, that how an animal dresses is of no concern to this Court.

Counsel relied on the decision in *Re Chicadee*, where he contends that in similar circumstances the accused was acquitted. However, this is a horse of a different color. A close reading of that case indictes [*sic*] that the animal in question there was not a small bird, but, in fact, a midget of a much larger species. Therefore, that case is inapplicable to our facts.

Counsel finally submits that the word 'small' in the title Small Birds Act refers not to 'Birds' but to 'Act,' making it the Small Act relating to Birds. With respect, counsel did not do his homework very well, for the Large Birds Act *** is just as small. If pressed, I need only refer to the Small Loans Act *** which is twice as large as the Large Birds Act.

It remains then to state my reason for judgment which, simply, is as follows: Different things may take on the same meaning for different purposes. For the purpose of the Small Birds Act, all two-legged, feather-covered animals are birds. This, of course, does not imply that only two-legged animals qualify, for the legislative intent is to make two legs merely the minimum requirement. The statute therefore contemplated multilegged animals with feathers as well. Counsel submits that having regard to the purpose of the statute only small animals 'naturally covered' with feathers could have been contemplated. However, had this been the intention of the legislature I am certain that the phrase 'naturally covered' would have been expressly inserted just as 'Long' was inserted in the Longshoreman's Act.

Therefore, a horse with feathers on its back must be deemed for the purposes of this Act to be a bird, and *a fortiori*, a pony with feathers on its back is a small bird.

Counsel posed the following rhetorical question: If the pillow had been removed prior to the shooting, would the animal still be a bird? To this, let me answer rhetorically: Is a bird any less of a bird without its feathers?"

To return to the case before the court, the relevant facts are that the tenant occupied a privately owned apartment under Section 8 of the United States Housing Act of 1937, a Federal welfare program which provides subsidized rent to qualified tenants. (42 U.S.C. § 1427f (1991) (Section 8).) Total rent for the apartment was approximately $573 per month, of which the tenant paid $6 and the Federal government paid approximately $567. At some point, the landlord determined that the tenant was abusing the premises and was therefore in breach of the lease. A notice to quit was served which was followed up by an eviction suit at law. Subsequent to the filing of the forcible entry and detainer suit, the landlord refused to accept the tenant's $6 share of the monthly rent but continued to accept the monthly government checks of approximately $567.

The applicable law is clear cut, simple, and conceded by the majority. Acceptance of rental payments which have accrued subsequent to a breach amounts to a waiver of the breach. Also, it is immaterial by whom the rent is paid if it is received as rent on behalf of tenant. 158 Ill. 2d at 104.

Both the trial court and the appellate court below ruled that acceptance of the rent money from the government amounted to a waiver of the breach. The landlord appealed and a majority of this court reverses. Its rationale? The monies which the landlord received from the government are not rent. Rather, they are housing assistance payments. Thus, since the landlord accepted housing assistance payments but not rent, there was no waiver of the tenant's breach by the landlord.

The majority cites both the lease agreement between the parties and Section 8 of the United States Housing Act of 1937 (the Act) (42 U.S.C. § 1427f (1991)), which authorizes the HUD payments, in support of its conclu-

sion. To begin, it is important to note that we should read the lease and the legislation in a light disfavoring forfeiture. "The forfeiture of leases is not favored and courts will readily adopt any circumstances that indicate an intent to waive a forfeiture." (*Housing Authority for La Salle County v. Little* (1978), 64 Ill. App. 3d 149, 150.) It is also significant that plaintiff drafted the lease. Thus, any ambiguities in the lease should be construed against plaintiff, *i.e.*, in favor of finding waiver. *Duldulao v. St. Mary of Nazareth Hospital* (1987), 115 Ill. 2d 482, 493.

The majority first examines the lease to determine whether the HUD payments were intended as rent. It focuses on one clause which states that the tenant will pay a certain amount for "rent," and that HUD will "make[ ] monthly payments to the Landlord on behalf of the Tenant *** called the tenant assistance payment[s]." To the majority, the different semantics of "rent" and "tenant assistance payments" demonstrate that HUD's payments are not rent.

I would first point out that, had the plaintiff referred to both the tenant's payments and the HUD payments as "rent," the result would have been confusing. Since plaintiff drafted the lease, instead of construing its attempt at clarity as creating two classes of payment with only one relevant in a waiver of forfeiture claim, the onus should be placed on plaintiff to specifically state that acceptance of the HUD payments is not tantamount to acceptance of rent.

Further, there are two other sections of the lease which indicate that the HUD payments were part of the total rent. Paragraph 4 is entitled "Changes in the Tenant's *Share* of the Rent" (emphasis added), which implies that HUD is paying the balance of the rent. Paragraph 4b again refers to the tenant's "share of the rent." Paragraph 7a indicates that the heat, cooking

and water utilities are included in the "Tenant Rent." Since it is unreasonable to believe that $6 per month could cover these utilities, the "Tenant Rent" must include the HUD payments.

Again, we should construe the lease against the drafter and against forfeiture. These rules of construction, applied to the terms of the lease, counsel a ruling that plaintiff waived its right of forfeiture by accepting the HUD payments.

The majority also comments upon the lack of a landlord/tenant relationship between plaintiff and HUD. They note that while plaintiff could terminate the agreement for nonpayment of rent, there was no similar remedy for nonreceipt of the housing assistance payment. (158 Ill. 2d at 105.) In addition, the majority makes the general observation that "HUD is not a party to the lease agreement and, it does not appear from the lease that HUD acquired any possessory interest in the property." (158 Ill. 2d at 105.) These observations lead the majority to conclude that, whatever HUD was doing, it was not paying rent.

Regarding the ramification of nonreceipt of the so-called housing assistance payment, if HUD were to conclude that the tenant was not entitled to the assistance payments and would stop making payments, the lease provides that the tenant is obligated to pay the entire rent.

The majority's conclusion that HUD is not a party to the lease agreement is likewise erroneous. Although it is true that HUD gains no proprietary interest, the lease is replete with conditions precedent requiring HUD approval. The rent may only increase with HUD approval; additional utility charges may be imposed on the tenant with HUD approval; assistance payments will only be made so long as HUD determines that the tenant is maintaining the dwelling in habitable condi-

tion; the tenant must supply HUD with income and family information before the lease agreement can be renewed; HUD sets the minimum size of the dwelling, based on a consideration of the size of the household and the ages and genders of its members; conditions of the lease may only be changed with HUD approval; termination of tenancy must be carried out in accordance with HUD regulations; and notices of termination must be given in advance, the time of which is set by HUD. HUD appears in 25 paragraphs or subparagraphs of the lease. It is an integral part of the agreement.

The majority then turns to the Act to determine whether Congress intended the assistance payments to serve as rent. They initially note that, following the owner's eviction of a tenant, the owner is entitled to vacancy payments for 60 days. "This suggests to us that the housing assistance payment flows with the rental unit, and not the Section 8 tenant." 158 Ill. 2d at 106.

I disagree. This suggests to me only the common-sense recognition that landlords might be unwilling to take on low-income tenants without a guarantee of rent. Congress tempered this caution with this two-month guarantee. This is entirely in accord with the Act's purpose of "aiding low-income families in obtaining a decent place to live and of promoting economically mixed housing." (42 U.S.C. § 1437f(a) (1991).) Further, to suggest that the payment flows with the rental unit and not the tenant ignores the fact that receipt of payment depends entirely on the tenant. Sixty days after he leaves, payment stops. New payments do not begin until there is a new tenant. Moreover, this rental guarantee is not designed to alter fundamental landlord/tenant law. It merely exists to protect the landlord in the event the tenant vacates the premises. It does not purport to exonerate a landlord who wishes to evict a tenant for a breach of a lease. The landlord in this situation has the

option to either evict the tenant for a breach and eschew continuing rental payments or to waive the breach and allow the occupancy to continue.

The majority finally states that "we do not believe that HUD intended that housing assistance payments be considered rent. To characterize the assistance as such would effectively defeat HUD's interest in the development and availability of economically mixed housing for low-income families. As a practical matter, landlords confronted with the possibility of forfeiture of breach for the acceptance of housing assistance payments would be less apt to open their doors to low-income families and would seek to fill their vacancies with non-rent-assisted families." 158 Ill. 2d at 106.

The majority offers nothing to indicate how it comes to believe that HUD did not intend the assistance payments be considered rent. Indeed, an examination of the statute and the Federal regulations demonstrates the opposite intent. The statute provides:

"The amount of the monthly assistance payment with respect to any dwelling unit shall be the difference between the maximum monthly rent which the contract provides that the owner is to receive for the unit and the rent the family is required to pay under [42 U.S.C. 1437a(a) (1991)]." (42 U.S.C. § 1437f(c)(3)(A) (1991).)

The Federal regulations implementing the statute define contract rent as "[t]he total amount of rent specified in the Housing Assistance Payments (HAP) Contract as payable to the owner by the Family, and by HUD or the PHA on the Family's behalf" (24 C.F.R. § 813.102), and again as "the rent payable to the owner under the contract, including the portion of the rent payable by the family." 24 C.F.R. § 886.302.

The regulations define the housing assistance payment as "the payment made by the contract administrator to the Owner of an assisted unit as provided in the Contract. Where the unit is leased to an eligible

Family, the payment is the difference between the Contract Rent and the Tenant Rent." (24 C.F.R. § 886.302.) The regulations further provide that the "Housing Assistance Payments will cover the difference between the Contract Rent and the Tenant Rent." 24 C.F.R. § 886.309.

These sections demonstrate that the rent is divided into two categories: the amount to be paid by the tenant and the amount to be paid by HUD. Acceptance of either of these subparts of the rent is an acceptance of rent.

Webster's Dictionary generally defines rent as income from a piece of property. (Webster's Third International Dictionary 1923 (1986).) Black's Law Dictionary defines rent as "[c]onsideration paid for use or occupation of property. In a broader sense, it is the compensation or fee paid, usually periodically, for the use of any property, land, buildings, equipment, etc." (Black's Law Dictionary 1166 (5th ed. 1979).) And, as stated by the appellate court below, "[i]t is difficult to imagine what the assistance payments are if they are not rent. The government sets the monthly rent for the unit. The family is required to pay a percentage of their income as part of the rental payment. The remainder is provided by HUD. It is unlikely that Congress intended for the tenant portion of the rent to be considered rent and the HUD portion to be considered nonrent." 241 Ill. App. 3d at 908.

Accordingly, I respectfully dissent from the majority's conclusion to the contrary.

JUSTICE HARRISON joins in this dissent.