WOODRIDGE HOMES LIMITED PARTNERSHIP, PLAINTIFF v. HEDY GREGORY, DEFENDANT

No. COA09-1024

(Filed 20 July 2010)

**Landlord and Tenant— breach of lease—rent subsidy payments—forfeiture—findings of fact based on misapprehension of controlling law**

The trial court erred by making findings of fact resting upon a misapprehension of controlling law, and thus, failed to support its conclusion of law that plaintiff landlord waived its claim that defendant tenant had breached a lease by accepting rent subsidy

payments with knowledge of defendant's acts of forfeiture. On remand, the trial court should take additional evidence and make additional findings on the issue of whether plaintiff accepted rental payments with knowledge of defendant's forfeiture of the lease.

Appeal by plaintiff from judgment entered 16 April 2009 by Judge John K. Greenlee in Gaston County District Court. Heard in the Court of Appeals 25 January 2010.

*Manning, Fulton & Skinner, PA, by Mr. Michael S. Harrell, for plaintiff-appellant.*

*Legal Aid of North Carolina, Inc., by Missy Phelps, Theodore O. Fillette, III, and Linda S. Johnson, for defendant-appellee.*

ERVIN, Judge.

Plaintiff Woodridge Homes Limited Partnership appeals from a judgment entered by the trial court granting a motion for involuntary dismissal made by Defendant Hedy Gregory pursuant to N.C. Gen. Stat. § 1A-1, Rule 41. After careful consideration of the facts in light of the applicable law, we conclude that the trial court erred by failing to apply the correct legal standard in deciding the legal issues arising upon the present record, that the trial court's judgment should be reversed, and that this case should be remanded to the trial court for further proceedings not inconsistent with this opinion.

## I. Factual Background

### A. Substantive Facts

In 1995, Plaintiff leased an apartment to Defendant at the Woodridge complex located in Mt. Holly, North Carolina. The initial lease period began on 16 January 1995, ran for one year, and was renewable for successive one-year terms "by written agreement signed by all parties . . . ." Apartments in the Woodridge complex are subsidized by the Rural Development Service of the United States Department of Agriculture.[1] Initially, Defendant was required to

---

1. Initially, the rent subsidies received by residents of the Woodridge complex were provided by the Farmer's Home Administration. The Farmer's Home Administration was subsequently renamed the Rural Housing Services. The offices of the Rural Housing Services are referred to as Rural Development. For ease of reference, we will refer to the source of the rent subsidies at issue in the remainder of this opinion as the Department of Agriculture.

make a monthly tenant contribution of $60.00 per month and to pay her own electric, cable, and telephone bills. By the time that this action commenced, Defendant's monthly rental payment and utility bills were completely subsidized by the Department of Agriculture, so that Defendant was not making any monthly tenant contribution or utility bill payments.

The lease under which Defendant occupied her apartment included a section entitled "Rules and Regulations." The specific regulations to which tenants were required to adhere provided, among other things, that:

4. Apartment garbage, rubbish, and other waste shall be removed in a clean and safe manner and all such matter shall be placed in receptacles provided.

. . . .

7. TENANT is to conduct himself and require other persons in the apartment or on the premises, with his consent, to conduct themselves in such a manner that other TENANTS' peaceful and quiet enjoyment of the premises is not disturbed and to assure that actions are not offensive, noisy, dangerous or disruptive to the rights, privileges and welfare of other TENANTS and persons.

. . . .

9. The sidewalks, entrances, porches, floors, and back yards shall be kept free from rubbish.

. . . .

12. The TENANT shall remove any abandoned vehicle within 48 hours of notice to do the same. Failure to do so is a violation of the terms of this agreement and the LANDLORD reserves the right to terminate the TENANT'S Lease and have the abandoned vehicle towed at owner's expense. An abandoned vehicle is defined as one without current state registration, inspection sticker displayed or license plate, or a vehicle that is not covered by insurance mandated by state law, or a vehicle that is not operable. . . .

. . . .

18. All maintenance requests shall be given to the LANDLORD in writing with the exception of emergencies. The LANDLORD

will provide a "TENANT MAINTENANCE REQUEST" form for reporting maintenance requests.

. . . .

20. TENANT shall neither deliberately nor negligently destroy, deface, damage, impair or remove any part of the apartment or premises, or permit or to fail to prevent any person in the apartment or on the premises to do so (whether known or unknown TENANT). TENANT shall immediately notify the LANDLORD as to any damages which occur and shall reimburse the LANDLORD for damages within 30 days of receipt of written statement from LANDLORD.

According to Section Twelve of the lease, "[a]t the close of the current lease period and for good cause, **either party may terminate this lease prior to expiration by giving the other written notice at least 30 days prior to move-out or date of termination.**" (emphasis in the original). In addition, Section Twelve, Subsection 2 of the lease provides that "Landlord may terminate this lease agreement, with proper notice, for the following reasons:

TENANT's **material noncompliance** with the terms of the lease, such as, but not limited to; (a) nonpayment of rent past a 10-day grace period; (b) nonpayment of any other financial obligations beyond the required date of payment; (c) repeated late payment of rent or other financial obligations; (d) admission to, or conviction of, any drug violations as defined in Section 18; (e) permitting unauthorized persons to live in the unit; (f) repeated minor violations of the lease; (g) one or more major violations of the lease.

(emphasis in the original). Finally, the lease provided that "[t]he failure or omission of LANDLORD to terminate this lease for any cause given above shall not destroy the right of the LANDLORD to do so later for similar or other causes" and that "[n]othing contained in this agreement shall be construed as waiving any of LANDLORD'S or TENANT'S rights under the laws of the State of North Carolina."

Between 29 January 2008 and 16 December 2008, Defendant received five separate notices that she had committed violations of the rules and regulations spelled out in the lease agreement. The first violation notice, which was dated 29 January 2008, cited Defendant for having left a trash can outside the door to her apartment. The second notice, dated 24 June 2008, involved Defendant's failure to report a

clogged air conditioner line. The third citation, which was dated 22 July 2008, alleged that Defendant left an abandoned vehicle on the property. The fourth notice, which was dated 9 December 2008, stemmed from Tenant's involvement in a confrontation with another tenant near a complex dumpster. The fifth and final notice, which was dated 16 December 2008, alleged that Defendant had failed to permit entry into her unit for maintenance performance on several occasions during 2008.

By means of a letter from Anitra McDaniel, a Senior Property Manager with GEM Management, Inc.,[2] dated 26 December 2008, Plaintiff notified Defendant of its decision not to renew the lease due to her "material noncompliance with the terms of the lease such as but not limited to (f) repeated minor violations of the lease" and "(g) one or more major violations of the lease."[3] According to the 26 December 2008 letter:

> We have observed you breaking your lease and we have issued Lease Violations to you over the past year for the following reasons: failure to dispose of garbage properly, failure to allow the peaceful and quiet enjoyment of other residents, failure by the resident to report Maintenance repairs in a timely manner, and refusing to allow Maintenance or other such hired Contractors entry [into] the unit to make necessary repairs and preventative maintenance. We have placed in your file a copy of all Lease Violations issued as well as additional supporting documentation to support our findings. In addition, you have repeatedly called and left disturbing messages on our office answering machine. Your messages have been disturbing to our staff and an intrusion of our business operation.

---

2. GEM is a management company that operates the Woodridge complex for Plaintiff.

3. At various points in its brief, Plaintiff contends that it merely attempted to terminate the lease at the end of the lease period and that Defendant was subject to removal pursuant to N.C. Gen. Stat. § 42-26(a)(1) since she was holding over after the term of her lease had expired. Plaintiff was not, however, entitled to seek to have Defendant ejected pursuant to N.C. Gen. Stat. § 42-26(a)(1). 7 C.F.R. § 3560.159(a) provides that "[b]orrowers, in accordance with lease agreements, may terminate or refuse to renew a tenant's lease only for material non-compliance with the lease provisions, material non-compliance with occupancy rules, or other good causes . . . ." Thus, Plaintiff would have been required to demonstrate adequate cause consistently with 7 C.F.R. § 3560.159(a), in order to refrain from renewing the lease. As a result, Plaintiff's contention that, "[a]s a holdover tenant, [Defendant] no longer could assert any defense to [its] summary ejectment action" lacks merit.

As a result, Plaintiff requested Defendant to vacate her apartment by 31 January 2009. Defendant did not, however, comply with Plaintiff's request. Following Defendant's refusal to vacate her apartment, Plaintiff initiated ejectment proceedings against Defendant. After sending the 26 December 2008 letter and initiating summary ejectment proceedings against Defendant, Plaintiff placed the rent subsidy payments which it received from the Department of Agriculture into a separate, non-interest bearing account which it labeled as an "escrow account."[4]

### B. Procedural History

On 13 February 2009, Landlord filed a complaint for summary ejectment against Tenant in the small claims division of the Gaston County District Court.[5] On 24 February 2009, the Magistrate entered judgment ordering that Defendant "be removed from and [Plaintiff] be put in possession of the premises described in the complaint." On 4 March 2009, Defendant noted an appeal to the District Court from the Magistrate's judgment.

On 16 April 2009, this case came on for a trial *de novo* before Judge John K. Greenlee in the Gaston County District Court. At the conclusion of Plaintiff's evidence, Defendant made an oral motion for involuntary dismissal of Plaintiff's complaint pursuant to N.C. Gen. Stat. § 1A-1, Rule 41(b), which the trial court granted. On 29 April 2009, the trial court entered a written order granting Defendant's motion. In its written order, the trial court found as a fact that:

2. [Plaintiff] rented a dwelling at 166 Houston Street, Apt. 41, Mt. Holly, NC to [Defendant] pursuant to a written lease.

---

4. Plaintiff did not receive a separate rent subsidy check relating to Defendant or any other Woodridge tenant. Instead, it received a single rent subsidy check for all of the occupants of the Woodridge complex. The Department of Agriculture does not have the ability to stop a subsidy payment relating to a particular tenant until the relevant apartment is no longer occupied. As a result, upon receipt of the single rent subsidy check, Plaintiff deposited the amount attributable to Defendant in this separate "escrow account." In the event that Defendant prevailed in this case, Plaintiff intended to apply the escrowed amount to the amount owed for the occupancy of Defendant's apartment. The record is silent concerning Plaintiff's intentions regarding the disposition of the escrowed money in the event that Plaintiff prevailed in the present litigation. In addition, the record does not indicate whether the Department of Agriculture would readily accept repayment of the subsidy amount paid on Defendant's behalf pending resolution of this litigation.

5. Plaintiff alleged in its complaint that Defendant had breached the lease because of a "failure to dispose of garbage," a "failure to allow the peaceful [and] quiet enjoyment," "[a]bandoned vehicle–not legal," and "failure to allow management in to make repairs."

3. [Plaintiff] sent to [Defendant] five (5) notices of lease agreement violation(s) throughout the year of 2008.

4. [Plaintiff] sent [Defendant] a notice on December 26, 2008 stating it was not renewing [Defendant's] lease because of good cause, citing the alleged violations that occurred during 2008.

5. [Plaintiff] continued to accept [Defendant's] rent subsidy from the U.S. Department of Housing and Urban Development (HUD)[6] through 2008 after having knowledge of the alleged lease violations.

6. [Plaintiff] waived its claims of [Defendant's] alleged breaches by continuing to accept [Defendant's] rent subsidy following each claimed violation during 2008.

Based on these findings of fact, the trial court concluded as a matter of law that:

1. [Plaintiff] has failed to meet its burden of proof in that [Plaintiff] waived its claims of [Defendant's] breaches by continuing to accept [Defendant's] rent subsidy after knowledge of such breaches.

2. [Plaintiff] did not promptly exercise its right to declare forfeiture of the lease, as required by *Charlotte Housing Authority v. Fleming*, 473 S.E.2d 373, 375 (N.C. App. 1996).

3. [Plaintiff] is not entitled to summary ejectment pursuant to N.C. [Gen. Stat. § ] 42-26(a)(2).

Thus, the trial court dismissed Plaintiff's complaint with prejudice. Plaintiff noted an appeal to this Court from the trial court's judgment.

## II. Legal Analysis

### A. Standard of Review

"The proper standard of review for a motion for an involuntary dismissal under Rule 41 is (1) whether the findings of fact by the trial court are supported by competent evidence, and (2) whether the findings of fact support the trial court's conclusions of law and its judgment." *Dean v. Hill*, 171 N.C. App. 479, 483, 615 S.E.2d 699, 701 (2005)

---

6. The trial court's finding that the subsidy for Defendant's rent was provided by the Department of Housing and Urban Development rather than the Department of Agriculture is erroneous. However, Plaintiff acknowledges, and we agree, that the trial court's error in identifying the source of the rent subsidy is of no consequence for purposes of evaluating the validity of Plaintiff's challenges to the trial court's judgment.

(quoting *McNeely v. Railway Co.*, 19 N.C. App. 502, 505, 199 S.E.2d 164, 167, *cert. denied*, 284 N.C. 425, 200 S.E.2d 660 (1973)). In addition, factual findings made "under a misapprehension of the controlling law" "may be set aside on the theory that the evidence should be considered in its true legal light." *African Methodist Episcopal Zion Church v. Union Chapel A.M.E. Zion Church*, 64 N.C. App. 391, 411, 308 S.E.2d 73, 85 (1983), *disc. review denied*, 310 N.C. 308, 312 S.E.2d 649 (1984) (citing *Helms v. Rea*, 282 N.C. 610, 620, 194 S.E.2d 1, 8 (1973), and *McGill v. Town of Lumberton*, 215 N.C. 752, 754, 3 S.E.2d 324, 326 (1939)). "[A] trial court's conclusions of law are reviewable *de novo* on appeal." *Riley v. Ken Wilson Ford, Inc.*, 109 N.C. App. 163, 168, 426 S.E.2d 717, 720 (1993). We will now apply this standard of review in examining the trial court's judgment.

### B.  Plaintiff's Challenges to the Trial Court's Judgment

### I.  Adequacy of Trial Court's Legal Conclusions

The essential thrust of the argument advanced by Defendant at trial, and accepted by the trial court, is that each of the notices of violation transmitted by Plaintiff to Defendant during the course of 2008 constituted a separate violation of the lease and that Plaintiff's decision to continue to accept a rent subsidy payment made by the Department of Agriculture on behalf of Defendant, instead of terminating the lease and seeking to have her evicted at the time that the violation occurred, constituted a waiver of the breach of the lease in question. After careful consideration of the language of the lease, we conclude that this argument is fundamentally inconsistent with the provisions of the agreement between the parties and that the trial court's decision to enter an order predicated on the validity of this argument constituted an error of law which necessitates an award of appellate relief.

"It is the settled law, no doubt, that the landlord who, with knowledge of the breach of the condition of a lease for which he has a right of reentry, receives rent which accrues subsequently, waives the breach, and cannot afterwards insist on the forfeiture." *Winder v. Martin*, 183 N.C. 410, 412, 111 S.E. 708, 709 (1922); *see also Community Housing Alternatives, Inc. v. Latta*, 87 N.C. App. 616, 618, 362 S.E.2d 1, 2 (1987) (stating that, "upon defendant's failure to vacate his apartment . . ., plaintiff had two choices: 1) it could commence proceedings to remove defendant from the premises, or 2) it could continue to accept rent from defendant and permit the lease to remain in force," but "could not do both," and by choosing "to accept

defendant's August and September rent" "it waived its right to assert defendant's prior violations of the lease provisions as grounds for termination of the lease"). In order for the common law waiver rule to apply, however, there must be both a "breach of the condition of a lease for which [the landlord] has a right of reentry" and a subsequent acceptance of rent. *Winder*, 183 N.C. at 412, 111 S.E. at 709. In other words, Plaintiff was not precluded from seeking to have Defendant ejected under the common law waiver rule until (1) it was entitled to terminate the lease, and (2) after becoming entitled to terminate the lease, it accepted rent payments with knowledge of its ability to declare the lease forfeited.

A careful reading of the relevant provision of Section Twelve, Subsection 2 of the lease indicates that Plaintiff was not entitled to terminate the lease in the absence of "repeated minor violations of the lease."[7] For that reason, Plaintiff did not have the right to terminate the lease based on just one of the five violations that are described in the record; instead, "repeated" violations were necessary in order to justify a decision to terminate the lease. For that reason, the mere fact that Plaintiff continued to accept rent subsidy payments made by the Department of Agriculture on Defendant's behalf throughout 2008 did not suffice, in our opinion, to trigger application of the common law waiver rule, since Plaintiff would not have had the right to terminate the lease and seek to have Defendant ejected from her apartment based upon the occurrence of an isolated minor violation of the lease.

Furthermore, even if one or more of Defendant's actions during 2008 constituted a "major" violation entitling Plaintiff to seek immediate termination of the lease or even if Plaintiff was entitled to terminate the lease prior to 26 December 2008 based on some lesser number of "repeated minor violations of the lease," the fact that Plaintiff did not act to terminate the lease prior to 26 December 2008 did not constitute a waiver of its right to terminate on that date because of the non-waiver provision of the lease. As we have already noted, Section Twenty-Two of the lease provides that "[t]he failure or

---

7. Although the 26 December 2008 letter makes reference to both "repeated minor violations of the lease" and "one or more major violations of the lease," the record does not reflect the extent to which the particular incidents specified in the 26 December 2008 letter constituted major or minor lease violations. In addition, the trial court's order does not specify the extent to which Defendant's alleged breaches of the lease are "minor" or "major." As a result, we will, for purposes of this opinion, assume that Plaintiff was proceeding against Defendant on a theory that she had engaged in "repeated minor violations of the lease."

omission of LANDLORD to terminate this lease for any cause given above shall not destroy the right of the LANDLORD to do so later for similar or other causes." When read in context, this provision clearly means that Plaintiff's failure to terminate the lease at a time when it otherwise could have done so did not preclude Plaintiff from terminating the lease "for similar or other causes" at a later time.[8] *See Long Drive Apartments v. Parker*, 107 N.C. App. 724, 729, 421 S.E.2d 631, 634 (1992), *disc. review denied*, 333 N.C. 345, 426 S.E.2d 706 (1993) (holding that a non-waiver clause in a HUD-approved lease "precludes an automatic waiver where the landlord has acquiesced to certain past conduct in violation of the lease agreement"). Thus, even if, as Defendant argues, Plaintiff was entitled to terminate the lease prior to 26 December 2008 and failed to do so, the language of Section Twenty-Two of the lease preserves its right to terminate the lease "for similar or other causes" at some point in the future. As a result, even if Plaintiff had the right to terminate the lease prior to 26 December 2008, it was not precluded from terminating the lease at that point, so that acceptances of rental payments prior to 26 December 2008 would not result in a waiver of its right to seek to have Defendant summarily ejected from her apartment based on a decision to terminate the lease at that time.

The trial court's findings of fact focus entirely on the events that occurred prior to the transmission of the 26 December 2008 letter. For example, Finding of fact No. 5 states that "[Plaintiff] continued to accept defendant's rent subsidy . . . through 2008 after having knowledge of the alleged lease violations." Similarly, Finding of Fact No. 6 states that "[Plaintiff] waived its claims of [Defendant's] alleged breaches by continuing to accept defendant's rent subsidy following each claimed violation during 2008."[9] However, given that Plaintiff did not have the right to terminate, or did not actually terminate, the lease until near the end of 2008, its acceptance of rental payments during 2008 would not work a waiver of its right to seek to eject De-

8. The reference to "similar or other causes" in this particular lease provision deprives Defendant's argument that Plaintiff was not entitled to terminate the lease because Defendant's lease violations were of different kinds of any persuasive force.

9. Although Plaintiff has not assigned error to these findings of fact, rendering them conclusive for purposes of appellate review, *Persis Nova Construction, Inc. v. Edwards*, 195 N.C. App. 55, 64, 671 S.E.2d 23, 28 (2009) (stating that, since "[d]efendants did not assign error to this finding," it "is binding on this Court"), it has challenged the legal sufficiency of the trial court's conclusions of law. The error we have identified in the trial court's order revolves around the extent to which the trial court's conclusion of law rests upon a proper understanding of the applicable law, which is an issue that Plaintiff has properly preserved.

fendant from her apartment despite the operation of the common law waiver rule. As a result, the trial court's findings of fact simply do not support its conclusion that Plaintiff "waived its claims of [Defendant's] breaches by continuing to accept [Defendant's] rent subsidy after knowledge of such breaches" because they were predicated on an incorrect legal theory. *African Methodist Episcopal Zion Church*, 64 N.C. App. at 411, 308 S.E.2d at 85.[10]

## 2. Effect of Post-26 December 2008 Rental Assistance Payments

After Plaintiff exercised the right to terminate the lease for "repeated minor violations of the lease" by sending the 26 December 2008 letter, the common law rule does potentially become applicable. *Community Housing Alternatives, Inc.*, 87 N.C. App. at 618, 362 S.E.2d at 2 (holding that landlord's acceptance of rent beyond the date of termination resulted in a waiver of the landlord's right to assert tenant's prior repeated violations of the lease as grounds for termination of the lease). In the event that Plaintiff accepted rent payments made on behalf of Defendant after sending the 26 December 2008 letter, it would arguably have waived the right to seek to have Defendant summarily ejected for the "repeated minor violations" outlined in that document.[11] As a result, we must next determine the extent, if any, to which the evidence concerning whether Plaintiff accepted rent payments with knowledge of Defendant's breaches of the lease agreements is in dispute. This requires us to determine both whether rental assistance payments provided by the Department of Agriculture constitute "rent" for purposes of the common law rule

10. The same logic disposes of Defendant's argument that Plaintiff failed to promptly exercise its right to declare a forfeiture as required by *Charlotte Housing Authority v. Fleming*, 123 N.C. App. 511, 513, 473 S.E.2d 373, 375 (1996). Since Plaintiff either terminated the lease as soon as it was allowed to do so or had the discretion to overlook earlier opportunities to terminate the lease by virtue of the non-waiver provision, we conclude that the trial court erred by concluding that Plaintiff "did not promptly exercise its right to declare forfeiture of the lease . . . ."

11. In its brief, Plaintiff appears to take the position that the non-waiver provision of Section Twenty-Two of the lease precludes the application of the common law waiver rule in this set of circumstances as well. However, we do not agree with this argument for two different reasons. First, the literal language of the non-waiver clause, which simply preserves the landlord's right to terminate the lease in the future despite having overlooked prior lease violations, does not apply to situations in which the landlord has acted to terminate the lease. Secondly, such an interpretation of Section Twenty-Two would eviscerate the second sentence of that provision, which states that "[n]othing contained in this agreement shall be construed as waiving any of LANDLORD'S or TENANT'S rights under the laws of the State of North Carolina." In the event that we were to read the non-waiver provision of the lease as expansively as Plaintiff suggests, nothing would be left of the second sentence of Section Twenty-Two.

and, if so, whether Plaintiff waived the right to terminate the lease by accepting rental payments.

The issue of whether rent subsidy payments made by the Department of Agriculture constitute rent for purposes of the common law waiver rule appears to be one of first impression. Although other jurisdictions have reached differing conclusions with respect to this issue in the context of subsidies provided under Section 8 of the United States Housing Act of 1937, neither party has cited us to any decision addressing this issue involving rent subsidy payments made by the Department of Agriculture. In concluding that rent subsidy payments made under Section 8 of the United States Housing Act did not constitute rent for purposes of the common law waiver rule, courts have relied upon four basic premises:

(1) Under the terms of the lease agreement between Midland and the tenant, which controlled the parties' rights and obligations, the housing assistance payments were not defined or referred to as rent;

(2) HUD was not a party to the lease agreement, and it did not appear from the lease agreement that HUD obtained any possessory interest in the property;

(3) When a subsidized housing unit becomes vacant following the eviction of an eligible tenant, under the terms of the housing assistance contract, the landlord is entitled continue to receive vacancy payments for 60 days (suggesting that the housing assistance payment flows with the rental unit, and not the section 8 tenant); and

(4) To characterize housing assistance payments as rent would effectively defeat HUD's interest in the development and availability of economically mixed housing for low-income families because landlords would be less apt to open their doors to low-income families and would seek to fill their vacancies with non-rent-assisted families.

*Westminster Corp. v. Anderson*, 536 N.W.2d 340, 342 (Minn. Ct. of App. 1995) (summarizing *Midland Management Co. v. Helgason*, 158 Ill.2d 98, 102-07, 630 N.E.2d 836, 839-41 (1994); *see also Savett v. Davis*, 29 Cal. App. 4th Supp. 13, 17-20, 34 Cal. Rptr. 2d 550, 552-54 (1994); *contra Greenwich Gardens Ass'n v. Pitt*, 126 Misc. 2d 947, 953-55, 484 N.Y.S.2d 439, 444-45 (1984); *Central Brooklyn Development Corp. v. Copeland*, 122 Misc. 2d 726, 729-30, 471

N.Y.S.2d 989, 993 (1984). Although these factors may be persuasive in the Section 8 context,[12] they do not satisfy us that rent assistance payments made under the Department of Agriculture program should be treated as something other than rent for purposes of the common law waiver rule.

Admittedly, the first two propositions set out in *Midland Management* apply to the present case, given that the lease clearly does not treat rent assistance provided by the Department of Agriculture as "rent" and given that the Department of Agriculture is neither a party to the lease nor receives any possessory interest in units in the Woodridge complex. However, we are not convinced that these factors are entitled to significant weight in our decision making process. First, the lease in question was clearly a standard Farmers Home Administration form. For that reason, it can hardly be taken as creating a bargained-for agreement between the parties to the effect that the rent assistance payments received by Plaintiff did not constitute rent. Secondly, the fact that the Department of Agriculture was not a party to the lease and did not receive a possessory interest in the apartment occupied by Defendant does not strike us as a particularly compelling reason for concluding that rent assistance payments provided by the Department of Agriculture do not constitute rent for purposes of the common law waiver rule, since there are many examples of third parties making rental payments on behalf of actual occupants of rented premises (such as parents making rental payments for premises occupied by their children). *Fairchild Realty Co. v. Spiegel, Inc.*, 246 N.C. 458, 468, 98 S.E.2d 871, 879 (1957) (holding that acceptance of rents paid by a lessee on behalf of a sublessee sufficed to waive the operation of a lease provision prohibiting subletting the premises in question). As a result, while both of the first two factors cited in *Midland Management* are also present here, we conclude that they are not entitled to significant weight in our decision making process.

In addition, we have found nothing tending to indicate that, under the Department of Agriculture rent assistance program, "the landlord is entitled to continue to receive vacancy payments for 60 days" "following the eviction of an eligible tenant." *See Westminster Corp.*, 536 N.W.2d at 342. Instead, rent assistance payments made under the Department of Agriculture program appear to be based on actual unit

12. For that reason, we express no opinion as to whether rent assistance payments made in connection with the Section 8 program constitute rent for purposes of the common law waiver rule.

occupancy. 7 C.F.R. § 3560.256(a) (stating that "[t]he borrower must submit monthly requests for [rental assistance] payments to the Agency based on occupancy as of the first day of the month previous to the month for which the request is being made"). Thus, unlike rent assistance payments made pursuant to the Section 8 program, rent assistance payments made in connection with the Department of Agriculture program are based on unit occupancy rather than simply "flow[ing] with the rental unit." *Westminster Corp.*, 536 N.W.2d at 342. As a result, this factor cuts in favor of treating rent assistance payments made in connection with the Department of Agriculture program as rent for purposes of the common law waiver rule.

The last reason given in *Midland Management* for treating rent assistance payments made under the Section 8 program as something other than "rent" for purposes of the common law waiver rule is essentially a policy justification. In essence, the final *Midland Management* argument amounts to a contention that, since treating rent assistance payments as something other than rent for purposes of the common law rule would ease the eviction process, that fact would make landlords more willing to accept low income families as tenants. Although this same policy justification could be deemed applicable in the Department of Agriculture context, there are other policy considerations which should be taken into consideration too, such as the principle that " '[o]ur courts do not look with favor on lease forfeitures.' " *Lincoln Terrace Associates, Ltd. v. Kelly*, 179 N.C. App. 621, 623, 635 S.E.2d 434 436 (2006) (quoting *Stanley v. Harvey*, 90 N.C. App. 535, 539, 369 S.E.2d 382, 385 (1988)). As a result, while the final *Midland Management* consideration is relevant to the situation that we face here, we do not believe that it is entitled to much weight in our decision making process given the existence of well-recognized countervailing policy considerations.

After carefully weighing the relevant considerations, we conclude that rent assistance payments under the Department of Agriculture program do, in fact, constitute rent for purposes of the common law waiver rule. Since "rent" is not defined in the lease itself, we look to the ordinary meaning of that term for purposes of informing our analysis and feel free to use dictionaries to determine the ordinary meanings of word in appropriate instances. *Charlotte Housing Authority*, 123 N.C. App. at 514, 473 S.E.2d at 375 (citing *E.L. Scott Roofing Co. v. State of N.C.*, 82 N.C. App. 216, 223, 346 S.E.2d 515, 520 (1986)). "Rent" is defined as "[c]onsideration paid, usu[ally] periodically, for the use or occupancy of property (esp. real

property)." B. Garner, *Black's Law Dictionary* 1410 (9th ed. 2009). Under that definition, the rent assistance payments that Plaintiff received clearly constitute "rent." Although the lease at issue here did not define the rent assistance payments made by the Department of Agriculture as rent and although the Department of Agriculture was not a party to the lease and did not obtain any sort of a possessory interest in the Woodridge complex, those facts do not persuade us to overlook the consistency of the rent assistance payments at issue here with the ordinary meaning of "rent." Similarly, the fact that treating the rent assistance payments at issue here as rental might make low income tenants eligible for rent assistance under the Department of Agriculture program less desirable tenants than they might otherwise be does not, in light of North Carolina's policy of looking with disfavor on lease forfeitures, tip the balance in favor of treating rent assistance payments as something other than rent for purposes of the common law waiver rule either. Thus, for all of these reasons, we conclude that rent assistance payments under the Department of Agriculture program are "rent" for purposes of the common law waiver rule.

Our conclusion that rent assistance payments under the Department of Agriculture program constitute rent does not, however, end our inquiry. Instead, we must also consider whether Plaintiff accepted rent payments made on behalf of Defendant with knowledge that Defendant had breached provisions of the lease so as to entitle Plaintiff to declare the lease forfeited. According to Ms. McDaniel, Plaintiff receives a single rent subsidy payment each month for all of the units in the Woodridge complex. Furthermore, the Department of Agriculture continues to send subsidy payments "unless the unit is vacant." In light of that fact, GEM created a non-interest bearing "eviction escrow account" into which subsidy payments relating to units which are the subject of ejectment proceedings could not be "touched, used, or consumed" by Plaintiff. Thus, the record reflects that subsidy payments relating to Defendant's apartment made since 26 December 2008 have been placed into such a non-interest bearing escrow account pending final resolution of this case.

In support of her contention that Plaintiff's actions since 26 December 2008 constitute acceptance of rent with knowledge of her alleged acts of forfeiture, Defendant cites *Office Enterprises, Inc. v. Pappas*, 19 N.C. App. 725, 200 S.E.2d 205 (1973). In *Office Enterprises*, this Court held that a landlord that received a rent

check and delivered that check to its attorney without cashing it had still accepted a rent payment for purposes of the common law waiver rule. 19 N.C. App. at 728, 200 S.E.2d at 207-08. In essence, *Office Enterprises* seems to suggest that the landlord should have returned the check to the tenant in order to have avoided waiving its right to declare the lease forfeited. It is not, however, clear that such an option was available to Plaintiff in this case. Given the payment mechanism employed by the Department of Agriculture, there does not appear to have been any way for Plaintiff to have avoided taking that portion of the overall subsidy payment relating to Defendant into its bank account in some form. We do not believe that we should hold landlords to a standard that it is not realistically possible for them to meet. For that reason, we hold that the mere fact that rent subsidy money relating to Defendant that was transmitted to Plaintiff as part of a larger payment entering Plaintiff's bank account does not constitute acceptance of rent from Defendant for purposes of the common law waiver rule. Moreover, once rent subsidy money relating to Defendant entered Plaintiff's bank account, it is not clear whether any mechanism under which the Department of Agriculture could have accepted a refund of that money from Plaintiff was readily available. If such a refund process was readily available, then Plaintiff should have taken advantage of it at the risk of being held to have waived the right to declare a lease forfeiture pursuant to the common law waiver rule. If no such refund process was readily available, then the escrow arrangement that Plaintiff actually adopted seems to be the closest that Plaintiff could have come to declining to accept the rent payment made by the Department of Agriculture on behalf of the Defendant.

At this point, the record is simply insufficient to permit a determination as to whether Plaintiff accepted rent paid on behalf of Defendant with knowledge that she had breached the terms of the lease. The trial court's findings of fact simply do not address the extent to which Plaintiff accepted rent payments made on behalf of Defendant after the transmission of the 26 December 2008 letter. In the event that the undisputed evidence permitted us to resolve the controversy between the parties, we would not hesitate to do so. *Green Tree Financial Servicing Corp. v. Young*, 133 N.C. App. 339, 341, 515 S.E.2d 223, 224 (1999) (stating that "when a court fails to make appropriate findings or conclusions, this Court is not required to remand the matter if the facts are not in dispute and only one inference can be drawn from them") (citing *Harris v. N.C. Farm Bureau Mut. Ins. Co.*, 91 N.C. App. 147, 150, 370 S.E.2d 700, 702 (1988). However, while the record does contain what appears to be undis-

puted evidence tending to show the manner in which Plaintiff handled rent payments made on behalf of Defendant after 26 December 2008, the record lacks sufficient evidence to permit a determination of what, if any, options were available to Plaintiff in terms of rejecting that portion of the monthly rental assistance payment received from the Department of Agriculture. Thus, we conclude that, on remand, the trial court should take additional evidence and make additional findings on the issue of whether Plaintiff accepted rental payments with knowledge of Defendant's forfeiture of the lease.

## III.  Conclusion

As a result, we conclude that the trial court erred by making findings of fact that rested upon a misapprehension of controlling law and, for that reason, the trial court's findings of fact failed to support its conclusion of law that Plaintiff had waived its claim that Defendant had breached the lease by accepting rent subsidy payments with knowledge of Defendant's acts of forfeiture. Thus, we reverse the trial court's judgment and remand this case to the trial court for further proceedings not inconsistent with this opinion.

REVERSED AND REMANDED

Chief Judge MARTIN and Judge ROBERT C. HUNTER concur.